Nos. 2025-1286, 2025-1296

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

NETLIST, INC.,
*Appellant*,

v.

SAMSUNG ELECTRONICS CO., LTD., MICRON TECHNOLOGY INC.,
MICRON SEMICONDUCTOR PRODUCTS, INC., MICRON TECHNOLOGY
TEXAS, LLC,
*Appellees.*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2023-00455, IPR2023-01142,
IPR2023-00454, IPR2023-01141

## APPELLEES' RESPONSE BRIEF

June 30, 2025

E. Joshua Rosenkranz
Emily W. Villano
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

*Counsel for*
*Micron Technology, Inc., Micron*
*Semiconductor Products, Inc.,*
*Micron Technology Texas, LLC*

Michael Hawes
Lori Ding
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, TX 77002
(713) 229-1234 (telephone)
michael.hawes@bakerbotts.com
lori.ding@bakerbotts.com

*Counsel for*
*Samsung Electronics Co., Ltd.*

*Additional counsel listed on inside cover*

Melanie L. Bostwick
Robbie Manhas
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037

Jared Bobrow
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025

*Counsel for
Micron Technology, Inc., Micron
Semiconductor Products, Inc.,
Micron Technology Texas, LLC*

Eliot Williams
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, DC 20001
(202) 639-7700 (telephone)
eliot.williams@bakerbotts.com

Theodore W. Chandler
BAKER BOTTS L.L.P.
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
(213) 202-5702 (telephone)
ted.chandler@bakerbotts.com

*Counsel for
Samsung Electronics Co., Ltd.*

## PATENT CLAIM LANGUAGE AT ISSUE

### U.S. Patent No. 11,093,417
### [Appx214]

1.    [1.a.1] A memory module

[1.a.2] operable in a computer system to communicate data with a memory controller of the computer system via a N-bit wide memory bus in response to read or write memory commands received from the memory controller,

[1.a.3] the memory bus including address and control signal lines and data signal lines,

[1.a.4] the memory module comprising:

[1.b] a printed circuit board having a plurality of edge connections configured to be electrically coupled to a corresponding plurality of contacts of a module slot of the computer system;

[1.c.1] logic coupled to the printed circuit board and configurable to receive a set of input address and control signals associated with a read or write memory command via the address and control signal lines and to output a set of registered address and control signals in response to the set of input address and control signals,

[1.c.2] the set of input address and control signals including a plurality of input chip select signals and other input address and control signals, the plurality of input chip select signals including one chip select signal having an active signal value and one or more other input chip select signals each having a non-active signal value,

[1.c.3] the set of registered address and control signals including a plurality of registered chip select signals corresponding to respective ones of the plurality of input chip select signals and other registered address and control signals corresponding to respective ones of the other input address and control signals, the plurality of registered chip select signals including one registered chip select signal having an active signal value and one or more other registered chip select signals each having a non-active signal value,

[1.c.4] wherein the logic is further configurable to output data buffer control signals in response to the read or write memory command;

[1.d.1] memory devices mounted on the printed circuit board and arranged in a plurality of N-bit wide ranks,

[1.d.2] wherein the plurality of N-bit wide ranks correspond to respective ones of the plurality of registered chip select signals such that each of the plurality of registered chip select signals is received by memory devices one respective N-bit wide rank of the plurality of N-bit-wide ranks,

[1.d.3] wherein one of the plurality of N-bit wide ranks including memory devices receiving the registered chip select signal having the active signal value and the other registered address and control signals is configured to receive or output a burst of N-bit wide data signals in response to the read or write command; and

[1.e] circuitry coupled between the data signal lines in the N-bit wide memory bus and corresponding data pins of memory devices in each of the plurality of N-bit wide ranks, the circuitry being configurable to transfer the burst of N-bit wide data signals between the N-bit wide memory bus and the memory devices in the one of the plurality of N-bit wide ranks in response to the data buffer control signals and in accordance with an overall CAS latency of the memory module;

[1.f] wherein data transfers through the circuitry are registered for an amount of time delay such that the overall CAS latency of the memory module is greater than an actual operational CAS latency of each of the memory devices.

## U.S. Patent No. 9,858,215
## [Appx154]

1.    [1.a.1] A memory module

[1.a.2] operable in a computer system to communicate data with a memory controller of the computer system via a memory bus in response to memory commands received from the memory controller,

[1.a.3] the memory commands including a first memory command and a subsequent second memory command, the first memory command to cause the memory module to receive or output a first data burst and the second memory command to cause the memory module to receive or output a second data burst,

[1.a.4] the memory module comprising:

[1.b] a printed circuit board having a plurality of edge connections configured to be electrically coupled to a corresponding plurality of contacts of a module slot of the computer system;

[1.c] a register coupled to the printed circuit board and configured to receive and buffer first command and address signals representing the first memory command, and to receive and buffer second command and address signals representing the second memory command;

[1.d.1] a plurality of memory integrated circuits mounted on the printed circuit board and arranged in a plurality of ranks including a first rank and a second rank, the plurality of memory integrated circuits including at least one first memory integrated circuit in the first rank and at least one second memory integrated circuit in the second rank,

[1.d.2] wherein the first rank is selected to receive or output the first data burst in response to the first memory command and is not selected to communicate data with the memory controller in response to the second memory command, and

[1.d.3] wherein the second rank is selected to receive or output the second data burst in response to the second memory command and is not selected to communicate data with the memory controller in response to the first memory command;

[1.e] a buffer coupled between the at least one first memory integrated circuit and the memory bus, and between the at least one second memory integrated circuit and the memory bus; and

[1.f.1] logic coupled to the buffer and configured to respond to the first memory command by providing first control signals to the buffer to enable communication of the first data bust between the at least one first memory integrated circuit and the memory controller through the buffer,

[1.f.2] wherein the logic is further configured to respond to the second memory command by providing second control signals to the buffer to enable communication of the second data burst between the at least one second memory integrated circuit and the memory controller through the buffer, the second control signals being different from the first control signals.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2025-1286

**Short Case Caption** Netlist, Inc. v. Samsung Electronics Co., Ltd.

**Filing Party/Entity** Samsung Electronics Co., Ltd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/30/2024

Signature: /s/ Michael Hawes

Name: Michael Hawes

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Samsung Electronics Co., Ltd. | Samsung Semiconductor, Inc. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable              ☐    Additional pages attached

| | | |
|---|---|---|
| Brianna Potter<br>Baker Botts L.L.P. | Ferenc Pazmandi<br><br>Baker Botts L.L.P. | John Gaustad<br>Baker Botts L.L.P. |
| | | |
| | | |

---

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑    Yes (file separate notice; see below)    ☐    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

---

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable              ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** | 25-1286

**Short Case Caption** | Netlist, Inc. v. Samsung Electronics Co., Ltd.

**Filing Party/Entity** | Micron Technology, Inc., Micron Semiconductor Products, Inc., Micron Technology Texas, LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/30/2024

Signature: /s/ E. Joshua Rosenkranz

Name: E. Joshua Rosenkranz

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Micron Technology, Inc. | | None |
| Micron Semiconductor Products, Inc. | | Micron Technology, Inc. |
| Micron Technology Texas, LLC | | Micron Technology, Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable            ☐     Additional pages attached

| | | |
|---|---|---|
| Winston & Strawn LLP | Juan Yaquian | Michael R. Rueckheim |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)     ☐  No     ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable            ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# **TABLE OF CONTENTS**

STATEMENT OF THE ISSUES ............................................................... 1

INTRODUCTION ................................................................................. 2

STATEMENT OF THE CASE ................................................................ 3

    I.      Level of ordinary skill and knowledge about the JEDEC
           standards ................................................................................. 3

    II.      JEDEC standards "JESD79-2" and "JESD21-C" ................................. 7

    III.      Perego's prior-art patent ........................................................ 8

    IV.      Netlist's '215 and '417 patents ............................................ 10

    V.      Present IPR Proceedings ........................................................ 12

          A.     The Board found that a POSITA would be familiar with
                 JEDEC standards ............................................................ 13

          B.     The Board construed "*rank*" to include one or more
                 memory devices, and found that Perego discloses "*ranks*"
                 of DDR2 SDRAM memory devices, providing a
                 motivation to combine Perego with JESD79-2 ..................... 13

          C.     The Board found several motivations to combine Perego
                 and JESD79-2, and that the combination would have
                 rendered all challenged claims obvious ............................ 17

          D.     The Director denied Netlist's requests for Director
                 Review ........................................................................ 20

SUMMARY OF ARGUMENT ............................................................. 22

ARGUMENT ..................................................................................... 27

    I.      Standard of Review ............................................................. 27

    II.      The Board had substantial evidence of known reasons a
           POSITA would have been motivated to combine Perego's
           teachings with the JESD79-2 JEDEC industry standard ............... 28

          A.     Perego discloses JEDEC-compliant embodiments, thus
                 suggesting their combination with the JESD79-2 JEDEC
                 industry standard ......................................................... 29

               1.     Perego's bussed topology embodiments confirm
                     that Perego discloses non-Rambus applications ............. 30

2.   Perego's 64-bit-width embodiment is compatible with JEDEC, but not Rambus..........................................33

3.   Perego discloses individual control lines compatible with JEDEC, but not Rambus......................35

4.   Perego's "flexibility" and "upgradeability" teach compatibility with JEDEC modules ...............................37

B.   Market forces also would have motivated a POSITA to combine Perego's teachings with the JESD79-2 JEDEC industry standard.......................................................................38

C.   The Board did not commit legal error, because its factual findings establish that Perego's JEDEC-compliant embodiments in combination with JESD79-2 are operable for their intended purpose ...........................................41

1.   Netlist mischaracterizes the Board's decision................43

2.   The assignment of Perego to Rambus does not limit the scope of Perego's disclosures to Rambus architectures....................................................................46

3.   Petitioner's proposed combination does not render Perego's JEDEC-compliant embodiments inoperable for their intended purpose.............................46

4.   Perego's flexibility supports a combination with the JESD79-2 JEDEC industry standard.........................49

5.   Netlist's cited cases do not show legal error by the Board................................................................................52

D.   Netlist fails to rebut the substantial evidence supporting the Board's finding that a POSITA would have been motivated to combine Perego with the JESD79-2 JEDEC standard .......................................................................................58

1.   The proliferation of JEDEC devices and modules would have motivated a POSITA to use Perego's techniques in JEDEC-compliant embodiments..............58

2.   Perego more than suggests JEDEC-compliant embodiments....................................................................60

3.   The Board correctly distinguished memory modules and memory devices.........................................62

    III.    The Board properly addressed Perego's touted flexibility..................64

CONCLUSION ........................................................................................................67

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adidas AG v. Nike, Inc.*,
  963 F.3d 1355 (Fed. Cir. 2020) ............................................................................55

*Almirall, LLC v. Amneal Pharms. LLC*,
  28 F.4th 265 (Fed. Cir. 2022) ..............................................................................27

*Apple Inc. v. Gesture Tech. Partners, LLC*,
  129 F.4th 1367 (Fed. Cir. 2025),
  *petition for cert. filed* (U.S. June 16, 2025) (No. 24-1281) .................................67

*Axonics, Inc. v. Medtronic, Inc.*,
  73 F.4th 950 (Fed. Cir. 2023) ........................................................... 25, 26, 52, 53

*Bosch Auto. Serv. Sols., LLC v. Matal*,
  878 F.3d 1027 (Fed. Cir. 2017),
  *as amended on reh'g in part* (Mar. 15, 2018) ............................................... 48, 57

*Chemours Co. FC v. Daikin Indus., Ltd.*,
  4 F.4th 1370 (Fed. Cir. 2021) ..............................................................................55

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) .............................................................................................27

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) .............................................................................................27

*Dow Jones & Co. v. Ablaise Ltd.*,
  606 F.3d 1338 (Fed. Cir. 2010) ...........................................................................38

*Elekta Ltd. v. ZAP Surgical Sys., Inc.*,
  81 F.4th 1368 (Fed. Cir. 2023) ............................................................................28

*Enova Tech. Corp. v. Seagate Tech. (US) Holdings Inc.*,
  706 F. App'x 987 (Fed. Cir. 2017) (nonprecedential) .................................. 57, 58

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966) .................................................................................................27

*In re Cree, Inc.*,
 818 F.3d 694 (Fed. Cir. 2016) ...............................................................33

*In re Fritch*,
 972 F.2d 1260 (Fed. Cir. 1992) ............................................................54

*In re Gartside*,
 203 F.3d 1305 (Fed. Cir. 2000) ............................................................27

*In re Gordon*,
 733 F.2d 900 (Fed. Cir. 1984) ..............................................................54

*In re Mouttet*,
 686 F.3d 1322 (Fed. Cir. 2012) .................................................... passim

*In re Ratti*,
 270 F.2d 810 (C.C.P.A. 1959).............................................. 49, 54, 55

*In re Schweickert*,
 676 F. App'x 988 (Fed. Cir. 2017) (nonprecedential) ........................55

*In re Urbanski*,
 809 F.3d 1237 (Fed. Cir. 2016) ............................................................54

*Intel Corp. v. Qualcomm Inc.*,
 21 F.4th 784 (Fed. Cir. 2021)...................................................... 48, 52

*KSR Int'l Co. v. Teleflex Inc.*,
 550 U.S. 398 (2007) .................................................................... passim

*McGinley v. Franklin Sports, Inc.*,
 262 F.3d 1339 (Fed. Cir. 2001) ............................................................55

*Merck Sharp & Dohme B.V. v. Warner Chilcott Co.*,
 711 F. App'x 633 (Fed. Cir. 2017) (nonprecedential) ........................55

*Novartis AG v. Torrent Pharms. Ltd.*,
 853 F.3d 1316 (Fed. Cir. 2017)............................................................67

*PGS Geophysical AS v. Iancu*,
 891 F.3d 1354 (Fed. Cir. 2018) ............................................................27

*Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*,
    600 F. App'x 755 (Fed. Cir. 2015) (nonprecedential) ........................................55

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
    882 F.3d 1056 (Fed. Cir. 2018) .................................................................... 65, 66

*Polaris Innovations Ltd. v. Brent*,
    48 F.4th 1365 (Fed. Cir. 2022) ..............................................................................25

*Randall Mfg. v. Rea*,
    733 F.3d 1355 (Fed. Cir. 2013) ................................................................... 27, 50

*Raytheon Co. v. Sony Corp.*,
    727 F. App'x 662 (Fed. Cir. 2018) (nonprecedential) ........................................56

*Regents of the Univ. of Cal. v. Broad Inst., Inc.*,
    136 F.4th 1367 (Fed. Cir. 2025) ..........................................................................67

*TriVascular, Inc. v. Samuels*,
    812 F.3d 1056 (Fed. Cir. 2016) ...........................................................................63

*Yeda Rsch. v. Mylan Pharms. Inc.*,
    906 F.3d 1031 (Fed. Cir. 2018) ...........................................................................39

## Statutes

35 U.S.C. § 103(a) ....................................................................................................60

## STATEMENT OF RELATED CASES

No appeal in or from the same action was previously before this or any other appellate court.  Below are cases known to counsel to be pending in any tribunal that will directly affect or be directly affected by this Court's decision in the pending consolidated appeals:

1.  *Netlist, Inc. v. Samsung Electronics Co., Ltd. et al.*, No. 24-2304 (Fed. Cir.) (appeal of IPR2022-00615 and IPR2023-00203 (PTAB))

2.  *Netlist, Inc. v. Samsung Electronics Co., Ltd.*, No. 2:22-cv-00293 (E.D. Tex.)

3.  *Netlist, Inc. v. Micron Technology, Inc. et al.*, No. 2:22-cv-00294 (E.D. Tex.)

4.  *Netlist, Inc. v. Google LLC*, No. 3:09-cv-05718 (N.D. Cal.)

5.  *Samsung Electronics Co., Ltd. et al. v. Netlist, Inc.*, No 1:21-cv-01453 (D. Del.)

6.  *Netlist, Inc. v. Samsung Electronics Co., Ltd.*, No. 8:20-cv-00993 (C.D. Cal.)

On January 21, 2025, this Court ordered that these consolidated appeals (Nos. 25-1286 and 25-1296) and related appeal No. 24-2304 (above) be treated as companion cases and assigned to the same merits panel.  *See* ECF No. 16.

## STATEMENT OF THE ISSUES

1.    Whether substantial evidence supports the Board's finding that a person of ordinary skill in the art would understand Perego's teachings to go beyond only a Rambus memory architecture and also embrace embodiments compliant with the JEDEC (the Joint Electron Device Engineering Council) industry standards used by the vast majority of the industry.

2.    Whether substantial evidence supports the Board's finding that a person of ordinary skill in the art would have been motivated to combine Perego with JEDEC's JESD79-2 industry standard, either because (1) Perego itself suggested implementing its buffered device in a JEDEC-compliant memory module or (2) the undisputed market dominance of the JEDEC standards would have motivated a skilled artisan to implement Perego's buffered device in a JEDEC-compliant memory module.

3.    Whether the Board in finding a motivation to combine adequately explained its rejection of one of Netlist's arguments—namely, that a skilled artisan would not have been motivated to combine Perego and JESD79-2 because the combination would supposedly destroy Perego's compatibility with Rambus and other generations of memory controllers and memory devices.

1

## INTRODUCTION

The Board reasonably found a motivation to combine the teachings of Perego and JEDEC's JESD79-2 industry standard on two independent bases: (1) Perego expressly suggested use of the corresponding JEDEC standard by disclosing JEDEC-compliant embodiments and (2) the market dominance of JEDEC's architecture at the relevant time would have motivated a skilled artisan to use Perego's data buffering in a memory module complying with JEDEC's JESD79-2 industry standard. While Netlist labels many of its challenges to the motivation to combine as "legal," each is premised on overcoming both of the Board's factual rationales. Netlist asks this Court to reweigh the evidence of what Perego teaches and Netlist never addresses the fact that the Board's market-forces rationale independently provides substantial evidence to affirm the Board's finding of a motivation to combine. Netlist's arguments, in sum, turn on efforts to reinterpret or ignore the evidence of record—something this Court does not do under the substantial-evidence standard

Netlist seeks to impose its own interpretation on Perego's teachings that would limit them to use of a Rambus architecture despite the Board's factual findings that Perego discloses alternative embodiments compatible with JEDEC but not with Rambus, including those with a bussed topology, 64-bit-width interface, and individual control lines. Appx22-32; Appx76-86. Based just on numerous

2

disclosures from Perego itself, the Board had substantial evidence to reject Netlist's interpretation.

The Board also analyzed the expert testimony in detail. For example, the Board recognized that there was no conflict between Netlist's expert testimony that a POSITA would understand certain terminology of Perego as referring to a Rambus architecture and the Board's own finding that such a POSITA would also understand Perego as not being *limited* to such an architecture. Appx22; Appx76. The Board then credited Petitioner's expert in finding that Perego suggests embodiments employing a JEDEC, not Rambus, interface and that a POSITA would have been motivated to combine such embodiments with the corresponding JEDEC industry standard because of Perego's suggestions and because of JEDEC's market dominance, as confirmed by Netlist's own expert. Appx30; Appx84.

## STATEMENT OF THE CASE

### I.  Level of ordinary skill and knowledge about the JEDEC standards

It is undisputed that a person of ordinary skill in the art for the '215 and '417 patents would have had knowledge about the "JEDEC industry standards" including "the design and operation of standardized DRAM and SDRAM memory ***modules***

3

and the operation of memory ***devices*** within those modules."[1]  Appx9-10;[2] *see also* Appx57-58 (similar).

"For over 50 years, JEDEC has been the global leader in developing and publishing open standards for the microelectronics industry.  JEDEC's membership consists of more than 3,000 volunteers representing nearly 300 member companies, and includes key technical individuals from most device, assembly, system and testing companies.  JEDEC publications and standards are adopted worldwide." Appx6318-19 ¶4.

As acknowledged by Netlist, Rambus had developed a different technology to try to compete with JEDEC.  *See* Br.15-18.  One important technical difference between JEDEC and Rambus is the way that read and write operations are communicated between (i) the memory controller on the host computer and (ii) the memory devices (which typically are on a memory module).  As detailed below, JEDEC's prior-art standards use a large number of wires, and each wire has a ***dedicated*** function—for example, there are dedicated wires for "data," "address," and "control" signals.  Appx6998.  These signals are transmitted in ***parallel***.  Br.14 (illustrating JEDEC-standardized module); *see also* Appx10136 (annotating

---

[1] All emphases added unless otherwise noted.

[2] Netlist initially omitted all knowledge of "design" from its description of the level of ordinary skill in the '417 patent, but this omission was later acknowledged to be an error.  *See* Appx8-9.

Appx6998-99; Appx7208; Appx6250, Appx6292-93).  Rambus, by contrast, uses significantly fewer wires and thus transmits signals as "packets"—which can combine data, address, and control information—and those packets reach each memory device in a linear "point-to-point" fashion.  Br.16-17.

Under JEDEC, a given command (e.g., read or write) is conveyed using a combination of five different signals on five *individual* wires (sometimes called lines): CS (chip select), RAS (row address strobe), CAS (column address strobe), WE (write enable), and CKE (clock enable).  Appx6293 & n.1; Appx6250; *see also* Appx6161; Appx6492-93.  Nineteen additional wires are required for the nineteen address signals (A0 to A15, and BA0 to BA2).  *Id.*  An illustration of how these 24 different wires may be used when transmitting read or write commands is shown below:

Table 10 — Command truth table.

| Function | CKE | | CS | RAS | CAS | WE | BA0 BA1 BA2 | A15-A11 | A10 | A9 - A0 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Previous Cycle | Current Cycle | | | | | | | | | |
| Bank Activate | H | H | L | L | H | H | BA | Row Address | | | 1,2 |
| Write | H | H | L | H | L | L | BA | Column | L | Column | 1,2,3, |
| Write with Auto Precharge | H | H | L | H | L | L | BA | Column | H | Column | 1,2,3, |
| Read | H | H | L | H | L | H | BA | Column | L | Column | 1,2,3 |
| Device Deselect | H | X | H | X | X | X | X | X | X | X | 1 |

NOTE 1   All DDR2 SDRAM commands are defined by states of CS, RAS, CAS, WE and CKE at the rising edge of the clock.

Appx10081 (annotating Appx6293).  In addition to the 24 wires above, separate wires are also used to transmit each bit of data—for example, 64 wires to transmit

64 bits of data in response to a read or write command to a memory module. Appx6161 ("DQ0-DQ63"); Appx6163-64 ("x64"); Appx6492 ("DQ[63:0]"); *see also* Br.9 ("64" "bits" "in parallel"). Thus, in this example of a JEDEC-compliant memory module, at least ***88 separate wires*** (24 + 64) would be needed between the memory module and the memory controller on the host computer. In the illustration below, those 88 separate wires are conceptually represented in groups by red and orange dots between the memory module and the memory controller:



Br.14 (reprinting Appx9804).

In contrast to the JEDEC approach, the Rambus approach used significantly fewer wires, such as "a total of ***nine (9) lines*** to carry all necessary information, including addresses, commands, chip-select information, and data." Appx7008. That was possible because "Rambus modules used a 'multiplexed' link that carried all types of signals (address, command, data, and chip-identification information)"

as "***packets***" of information (rather than sending the information in parallel on separate wires like JEDEC). Br.16-17 (citing Appx7132-33). Being "multiplexed" means that "different types of signals travel over the ***same*** set of electrical wires but at different times." *Id.* (internal quotation marks omitted) (quoting Appx7003). Consistent with Rambus's different approach, the Rambus XDR architecture was particularly known for its narrow "point-to-point" topology, in contrast to the wide "busses" used by JEDEC, as Netlist admits. Br.13-14, 16-18.

It is undisputed that by the 2004-2005 timeframe relevant to this appeal, JEDEC had won out in the marketplace over Rambus, and "the vast majority of DRAM devices and modules sold would have been compliant with one of the JEDEC standards[.]" Appx11429-30 ¶72; *see also* Appx14015 ¶72; Appx8152-53 (145:17-146:24); Appx8194 (187:21-25); Appx8290-93 (283:18-286:15) ("the JEDEC way of doing things . . . won out" and "the industry did select the JEDEC approach and reject the Rambus approach" by 2004-2005).

## II.   JEDEC standards "JESD79-2" and "JESD21-C"

Two acronyms relevant to JEDEC are "JESD79-2" and "JESD21-C," as Netlist acknowledges. Br.12-13, 28.

"JESD79-2" is the JEDEC standard for DDR2 SDRAM memory devices. Appx6238. JESD79-2 requires certain individual control lines from the memory controller to the memory device, such as CS (chip select), RAS (row address strobe),

CAS (column address strobe), as illustrated above (pp.5-6). Petitioner relied on JESD79-2 for its obviousness combination, Appx2; Appx52, but Netlist's arguments on appeal do not discuss JESD79-2 at all, *see* Br.33-61.

"JESD21-C" is the term used by the parties to refer to certain JEDEC standards for specific memory ***modules***, including those with DDR2 SDRAM memory ***devices*** that comply with the JESD79-2 standard and thus have individual control lines (e.g., for CS, RAS, CAS, etc.) from the memory controller as illustrated above (pp.5-6). Appx10109 (annotating Appx6250; Appx6161; Appx6492-93). Those modules can have a data width of 64 bits. *See, e.g.*, Appx6160. JESD21-C was not part of Petitioner's obviousness combination, but instead was used as support for "the type of knowledge that the parties agree [that] a person of ordinary skill in the art would have had," including that JEDEC-compliant modules can be 64 bits wide. Appx31; Appx85. Netlist's arguments on appeal repeatedly discuss JESD21-C, even though it was not part of Petitioner's obviousness combination. Br.41, 45, 47, 49, 53-55. Netlist concedes that for JEDEC-compliant modules, "[t]ypical module bit widths are 64 or 72 bits." Br.9 (citing Appx6163-64 ("x64" and "x72")).

## III.   Perego's prior-art patent

The "Perego" prior-art patent was part of the obviousness combination in both IPRs. Appx2; Appx52.

Perego teaches putting a "buffer device" (red below) on a memory module to provide "***isolation*** between signals interfacing to controller 310 and signals interfacing to the plurality of memory devices 360" (green and blue below), Appx7337 (6:12-15), which Perego expressly teaches may be "Double Data Rate 2 (DDR2) . . . Synchronous DRAM (SDRAM) devices," Appx7339 (10:58-59); Appx7338 (8:1-4). Netlist concedes JESD79-2 is the JEDEC standard for those memory devices. Br.12.



**FIG. 3B**

Appx10099 (annotating Appx7321).

Perego teaches that the buffer device (red above) "effectively reduces . . . ***loading***," Appx7337 (6:44-45), which refers to a known characteristic of electricity

in which "more loading . . . typically means more ringing, longer delay, and slower rise time," Appx7186. Loading is a characteristic of electricity and is not specific to Rambus or JEDEC architectures. It is undisputed that a POSITA was familiar with loading and that "within the context of 2004-2005 and the knowledge and experience of a POSITA . . . that reducing or otherwise managing loads to minimize their impact on data communications is a good thing." Appx8137-38 (130:6-131:8); *see also* Br.14-15; Appx8143-44 (136:3-137:11).

Perego's buffer device, illustrated above, would necessarily add some delay to the signals going through it, and Netlist does not challenge on appeal the Board's finding that it was obvious to a POSITA that the timing for those signals (including a timing parameter called "CAS latency") would thus need to be increased accordingly. Appx38-41; Appx89-90; *see also* Br.22-23 (discussing CAS latency); Appx10144 (annotating Appx6256, Appx7011-12).

## IV. Netlist's '215 and '417 patents

Over a year after Perego's patent application was filed, Netlist filed continuation-in-part applications on July 1, 2005, and January 19, 2006, which eventually resulted in the '215 and '417 patents at issue in this appeal. Appx103; Appx158; Appx244-48; Appx12287-90.

Like Perego, Netlist's '215 and '417 patents teach putting a buffer (red below) on a memory module (10) that "***isolates*** the ***loads*** of at least some of the memory

10

devices 30" (green and blue below) from the memory controller (20).  Appx139 (7:14-29); Appx197 (7:61-8:9).   The memory devices (30) can be "DDR2." Appx146 (21:10); Appx205 (23:25).

# '417/215 Patents



Appx10099 (annotating Appx113, Appx171); *see also* Br.20-21.  Like the buffer in Perego, the buffer in Netlist's '215 and '417 patents adds some delay to the data signals going through the buffer, and thus the timing for those signals needs to be adjusted accordingly, such as by adding one clock cycle to the CAS latency as taught by the JESD79-2 standard.  Appx10138 (annotating Appx145 (20:22-46); Appx204 (22:36-60)); Appx10144 (annotating the JESD79-2 standard, which "doesn't support half clock cycle latency," Appx6256).

11

## V.    Present IPR Proceedings

The '215 and '417 patents at issue in this appeal are related to a third patent (U.S. Patent No. 7,619,912) that is the subject of a companioned appeal before this Court (No. 24-2304).   *See* Appx103, Appx158, Appx2186 (claiming common priority to applications filed in 2004-2005).   After Netlist suggested that Samsung might be infringing this family of patents, Samsung filed IPR petitions, first against the '912 patent, and then against the '215 and '417 patents.  Appx2409; Appx12262; Appx224.   Micron later joined each of these IPRs.   Appx1 n.1; Appx51 n.1; Appx10011 n.1.  Netlist asserted all three patents against both Samsung and Micron in the Eastern District of Texas.  Appx7761; Appx7810.

In both IPRs, Petitioner's primary ground (Ground 1) against each of the '215 and '417 patents was the combination of Perego with the JEDEC standard JESD79-2 for DDR2 SDRAM memory devices.  Appx2; Appx52.  Petitioner further proposed additional Grounds involving other references that also taught data buffers on JEDEC-compliant memory modules, Appx350-54; Appx359-62; Appx12394-98; Appx12408-10, but the Board ultimately determined that the subject matter of all challenged claims would have been obvious in view of Ground 1, so the Board did not reach any of the additional Grounds, Appx47-48; Appx94-96.

The only issue on appeal is the Board's finding of a motivation to combine Perego and JESD79-2 for Ground 1 in each IPR.  *See* Br.5; Appx2; Appx52.  The

12

Board's analysis on this point, discussed below, is substantially identical in the Final Written Decisions for each of the '215 and '417 patents. *Compare* Appx21-32, *with* Appx75-86. Netlist does not challenge on appeal the Board's finding that, in the proposed combination for Ground 1, every limitation of the challenged claims would have been obvious. *See* Br.5.

### A. The Board found that a POSITA would be familiar with JEDEC standards

In the Final Written Decisions, the Board found—based on the testimony of both experts and the agreement of the parties—that the knowledge of a POSITA "includes knowledge of JEDEC industry standards." Appx8-10 (citing Appx1437-39 ¶¶48-50 and Appx11427-28 ¶68); *see also* Appx57-58. This undisputed finding supported the Board's ultimate determination that implementing JEDEC-standard features in Perego, such as an input chip select (CS) signal, would have been obvious. *See* Appx31-32, Appx84-86 ("[This is] the type of knowledge that the parties agree [that] a person of ordinary skill in the art would have had.").

### B. The Board construed "*rank*" to include one or more memory devices, and found that Perego discloses "*ranks*" of DDR2 SDRAM memory devices, providing a motivation to combine Perego with JESD79-2

By the time of the Final Written Decisions, there was no disagreement about claim construction, and on appeal Netlist has not raised any claim construction issues.

13

With respect to the term "*rank*," which is used in all the claims, Petitioner proposed the same claim construction for that term in all the IPRs against the '912, '215, and '417 patents: "an independent set of *one or more* memory devices on a memory module that act together in response to command signals, including chip-select signals, to read or write the full bit-width of the memory module." Appx265-67 (citing, e.g., Appx1525 ¶126; Appx7208); Appx12309-12 (citing, e.g., Appx13652-53 ¶126; Appx7208); Appx2430-33 (citing, e.g., Appx7208); *see also* Appx10088-95.

Netlist initially disputed the construction for "*rank*" in the '215 patent. Appx12454-59. In its Institution Decision, the Board agreed with Petitioner's position and "preliminarily determine[d] that a rank may have only one memory device." Appx12566-70. After institution, Netlist decided not to contest Petitioner's construction for "*rank*" in the '215 and '417 patents as including "*one or more*" memory devices, Appx634-35; Appx12668-69, which was consistent with the testimony of Netlist's own expert in these IPRs, who (i) claimed he personally started the industry shift from the term "bank" to "rank," Appx8396 (389:15-390:13), and (ii) published a book in 1996 stating that a "rank . . . typically consists of *one or more* DRAMs," Appx9148.

Given Netlist's agreement to "appl[y] Petitioner's proposed construction" for the '215 and '417 patents, the Board's Final Written Decisions adopted Petitioner's

14

construction for "*rank*" as including "one or more" memory devices.  Appx10-11; Appx58-59.  The construction adopted by the Board aligned with the construction of "*rank*" by the district court, Appx11794-97, Appx11818, and in the IPR against the related '912 patent, Appx10023-34.

Netlist does not challenge the construction of "*rank*" in this appeal.  *See, e.g.*, Br.9-11 & n.4 (citing Appx7208).  Furthermore, although Perego uses the older term "bank" instead of the newer term "rank," Netlist does not challenge on appeal the Board's finding that Perego discloses "*ranks*" of DDR2 SDRAM memory devices.  Appx67-71 (citing, e.g., Appx7339 (10:56-58); Appx7342 (15:37-45)).

Given that Perego expressly discloses DDR2 SDRAM memory devices (shown in green and red below), Appx7339 (10:56-58) ("DDR2"); *see also* Appx7338 (8:1-9), the Board found a straightforward motivation to combine Perego with JESD79-2:  "[W]e find that a person of ordinary skill in the art would have had reason to combine the teachings of Perego and JESD79-2 given Perego's express disclosure of using DDR2, for which the industry specification is JESD79-2."  Appx71.

15



Appx10099 (annotating Appx7321).

On appeal, Netlist does not challenge the motivation to combine Perego and JESD79-2 with respect to the DDR2 memory devices in Perego (shown in green and red above). *See, e.g.*, Br.12 (admitting JESD79-2 is the "standard" for "DDR2 SDRAMs"). In fact, Netlist's arguments on appeal do not discuss JESD79-2 at all. Br.33-61. Instead, Netlist's arguments on appeal focus exclusively on the signals at the interface between the memory controller and the memory module (e.g., at 390 along the bottom of Perego above), which Netlist contends must always comply with the Rambus architecture and cannot be individual signals that comply with JESD79-2 (e.g., RAS, CAS, and CS as discussed above, pp.5-6), because according to Netlist using signals that comply with JESD79-2 "would render Perego's system 'non-functional' for the competing Rambus architecture for which Perego's system was designed." Br.5. The Board disagreed for several reasons discussed below.

16

**C.      The Board found several motivations to combine Perego and JESD79-2, and that the combination would have rendered all challenged claims obvious**

With regard to the motivation to combine Perego and the JESD79-2 standard, the Board made two independent findings relevant to Netlist's arguments on appeal: (1) "Perego's disclosure suggests a JEDEC-compliant interface to a memory controller," Appx23-28; Appx77-82, and (2) "a person of ordinary skill in the art would have been motivated to make a module JEDEC-compliant based on JEDEC's dominance in the market at the time," Appx28-30 (citing Petitioner's expert, Appx1558-59 ¶183); Appx82-84 (citing Petitioner's expert, Appx13690-91 ¶188).

The Board supported its first basis for a motivation to combine—that Perego suggests a JEDEC-compliant interface—by relying on multiple disclosures in Perego as well as the testimony of each party's expert.  First, the Board recognized that "Perego discloses busses as an alternative to the point-to-point topology that [Netlist's expert] says is indicative of Rambus XDR."  Appx23, Appx77 (citing Appx7338 (8:42-47, 8:51-65)); *see also* Appx22 (discussing testimony of Netlist's expert about Rambus XDR at Appx11446 ¶96); Appx76 (same, citing Appx14033 ¶99).  Second, the Board considered Perego's disclosure of a 64-bit interface width. Appx23-25 (citing Appx7341 (14:19-23); Appx1585-86 ¶215; Appx11429-30 ¶72; Appx11435-36 ¶82); Appx77-79 (similar); *see also* Appx13720-21 ¶224; Appx14015 ¶72; Appx14022 ¶85.  The Board found that "the evidence shows that a

17

64-bit data width is a JEDEC-compliant module width and is not limited to a Rambus XDR module width, supporting Petitioner's contention that Perego's disclosure suggests a module that can be configured to have a JEDEC interface." Appx24; Appx78-79. Third, the Board looked to Perego's disclosure of individual control lines for "row address strobe (RAS) and column address strobe (CAS)," which "are JEDEC module input signals and not Rambus signals." Appx25-26 (citing Appx1587-89 ¶¶217-18); Appx79-80 (similar); *see also* Appx13722-24 ¶¶ 226-27. The Board further relied on the admissions of Netlist's expert "that individual address lines as disclosed in Perego are not characteristic of Rambus-type memories." Appx26 (citing Appx11411-12 ¶46); Appx80 (citing Appx13998-99 ¶46). In particular, consistent with the illustration below, the Board found a motivation to combine Perego and JESD79-2 to use individual control lines— including for row address strobe (RAS), column address strobe (CAS), and chip-select (CS)—on Perego's "RQ" lines. Appx25-27, Appx30-32; Appx79-81, Appx85-87.



Appx10104 (annotating Appx7323; Appx7339 (9:50-60); Appx6250).

The Board supported its second basis for a motivation to combine—the

dominance of JEDEC in the market—with admissions by Netlist's own expert that:

> in the 2004-2005 timeframe, the vast majority of the DRAM devices
> and modules sold would have been compliant with one of the JEDEC
> standards, such that a general reference to DRAM, especially in the
> context of usage main memory of general purpose computer and server
> systems, would suggest to a [person of ordinary skill in the art] the use
> of JEDEC-standard compliant SDRAM devices or modules.

Appx28-29 (quoting Appx11429-30 ¶72); Appx82-83 (quoting Appx14015 ¶72).

The Board also relied on similar testimony by Petitioner's expert. Appx30 (quoting

Appx1558-89 ¶183); Appx84 (quoting Appx13690-91 ¶188).

Having found two reasons that a POSITA would be motivated to combine Perego and JESD79-2, the Board then found that the combination disclosed or would have rendered obvious each limitation in the challenged claims. Appx41; Appx47; Appx94. For example, the Board found that it would have been obvious to add an additional clock cycle to the overall "CAS latency" of the memory module in the proposed combination to account for the "latency added by [Perego's] buffer device," while still complying with the timing requirements in JEDEC's JESD79-2 standard. Appx38-41; *see also* Appx89-90.

On appeal, Netlist does not challenge the Board's findings about how the cited prior art teaches all claimed limitations—Netlist only disputes the Board's finding of a motivation to combine Perego and JESD79-2. *See* Br.5.

### D. The Director denied Netlist's requests for Director Review

After the Board's Final Written Decisions, Netlist filed requests for Director Review. Appx1015-31; Appx12935-51. Netlist did not raise with the Director its primary argument to this Court—i.e., that the Board supposedly "***agreed*** with Netlist that ***Samsung's*** obviousness theory rendered Samsung's primary reference ***inoperable*** for its intended purpose." Br.1. Nor did Netlist assert, as it does now in support of that argument, that there was a typographical error in both of the Final

20

Written Decisions.[3]    Instead, Netlist contended that the asserted obviousness combination did not teach "the claimed input chip-select signals."    Appx12944; Appx1024 (similar).    Netlist's requests for Director Review were denied.    Appx99-100.

---

[3] The Final Written Decisions stated that "***Patent Owner***'s 'proposed' modifications would make Perego's system non-functional for Rambus, not for JEDEC . . .", thus rejecting ***Patent Owner***'s arguments for improperly assuming that Perego was limited to Rambus embodiments.  Appx29; Appx83.  Netlist now contends that the reference to "Patent Owner" (i.e., Netlist) was a "typographical error" and thus (according to Netlist) the Board was actually referring to ***Petitioner***'s proposed modifications.  Br.32 n.10; *infra* pp.43-46.  Despite the significance of this supposed typographical error to Netlist's theory on appeal, Netlist never asked the Board or the Director to change this sentence to read the way that Netlist now repeatedly presents this sentence on appeal.  *See* Br.1, 2, 32, 33-34, 38, 41, 59 n.12.

## SUMMARY OF ARGUMENT

The Board properly found a motivation to combine based independently on both its reasonable reading of Perego as expressly teaching JEDEC-compliant embodiments to a POSITA and its analysis of the undisputed evidence that market forces by themselves provided reason for a skilled artisan to use Perego's data buffering in a JEDEC-compliant module by the mid-2000s. Each of those reasons is supported by substantial evidence and each, by itself, supports the Board's finding of a motivation to combine.

First, what the prior art teaches to a POSITA is a factual question and the Board conducted a detailed analysis assessing multiple disclosures of Perego and the expert testimony offered by both parties. The Board found that Perego discloses (1) using a JEDEC-compliant bussed topology as an *alternative* to the Rambus point-to-point link topology, Appx22-23, Appx27-28; Appx76-77, Appx81-82; (2) a JEDEC-compliant 64-bit data width as an *alternative* to various Rambus-compatible interface widths, Appx23-24; Appx77-79; and (3) individual control lines—including dedicated lines for the JEDEC-specific RAS and CAS control signals—as an *alternative* to the Rambus packetized signal approach. Appx25-27; Appx79-81. Even beyond those JEDEC-compliant disclosures, Perego touts the "flexibility" of its buffer such that it may be used with many different configurations of memory modules, memory controllers, and memory devices—which the Board

22

reasonably interpreted as including JEDEC-compliant modules, controllers, and devices. Appx27-28; Appx81-82. The Board's finding of a motivation to combine is therefore supported by the substantial evidence of Perego's express disclosures.

The Board recognized that *some* Perego embodiments use a Rambus architecture, but that is completely consistent with the Board's extensive findings that *other* Perego embodiments contemplate a JEDEC-compliant architecture. After acknowledging the Rambus embodiments, for example, the Board found that "Perego's disclosures are not limited to that [Rambus] architecture." Appx22; Appx76. The Board then analyzed Perego's many "alternate embodiments," a term Perego uses eighteen times, and determined as a factual matter that many were compatible with JEDEC rather than Rambus. *See, e.g.*, Appx25-26, Appx80 ("The evidence shows that row address strobe (RAS) and column address strobe (CAS) are JEDEC module input signals and not Rambus signals."). The Board reasonably assessed all that Perego teaches. This Court has long recognized that prior art references can teach multiple embodiments, here Rambus and JEDEC embodiments, and that each such embodiment can be the source of teachings for ordinarily skilled artisans. That is exactly what the Board found as a factual matter. Appx22-32; Appx76-86.

Second, the Board independently found a motivation to combine based on the undisputed fact that JEDEC-compliant modules had come to dominate the

23

marketplace by the mid-2000s. Appx28-29 (quoting Appx11429-30 ¶72); Appx82-83 (quoting Appx14015 ¶72). The Board found that such market forces would have driven a skilled artisan to take Perego's teachings—such as its beneficial ability to electrically "isolat[e] the memory devices from the memory controller," Appx40, Appx91 (citing Appx7337 (6:12-15))—and implement them in a JEDEC-compliant module. Appx28-29; Appx82-83. Netlist's own expert testimony was substantial evidence for that finding. Appx29, Appx83 ("Patent Owner's own expert explains that JEDEC was a driving market force at the relevant time."). In other words, independent of its determination that Perego discloses alternative embodiments using a JEDEC system, the Board separately found that JEDEC's market dominance at the time would have motivated the proposed combination. Both the Board's factual findings and reasoning on this point are undisputed by Netlist and, by themselves, support affirmance.

Moreover, Netlist's primary "legal" issue on appeal is a red herring. Netlist contends that combining Perego with any JEDEC standard would render Perego "inoperable for its intended purpose." Br.1. The fallacies of Netlist's argument are twofold, requiring the Court to (1) assume, contrary to Board findings, that the only "intended purpose" of Perego is a Rambus architecture and (2) ignore the Board's independent finding of motivation due to JEDEC's market dominance. In view of the Board's factual findings, Netlist's "legal" argument never gets off the ground.

The real question is "whether the relevant artisan would be motivated to make the combination to arrive at the claims' actual limitations," not the intended purpose, use, or requirements of the prior art. *Axonics, Inc. v. Medtronic, Inc.*, 73 F.4th 950, 956-57 (Fed. Cir. 2023). Here, each of the Board's rationales independently supplies just such a motivation, and substantial evidence supports the Board's weighing of conflicting evidence regarding a motivation to combine.

Netlist's brief repeatedly misquotes the Board, under the guise of fixing an alleged "typographical error," Br.32 n.10, to suggest that the Board found that Perego *only* taught Rambus embodiments, when in fact there is no typographical error and the Board repeatedly found that Perego teaches JEDEC-compliant embodiments. In essence, "the bulk of [Appellant]'s argument on appeal—contending that the Board [adopted a certain argument]—is founded on a faulty premise." *Polaris Innovations Ltd. v. Brent*, 48 F.4th 1365, 1378 (Fed. Cir. 2022).

Equally unavailing is Netlist's related contention that the Board erred in finding a motivation to combine because the resulting memory module would supposedly sacrifice what Netlist calls Perego's "principal benefit" (Br.30) and "principle of operation" (Br.44): its buffer-translation functionality that translates between protocols used by a memory controller and memory devices. The Board disagreed, and found that Perego's "flexibility" and "upgradeability" suggested compatibility with JEDEC, not just Rambus. Appx27-28; Appx81-82. Furthermore,

25

Netlist's argument about Perego's "principal benefit" is inconsistent with the legal standard for a motivation to combine, because a "skilled artisan may be motivated to combine particular features of different references"—even features that a prior-art reference requires for its own purposes—"*e.g.*, *to secure some benefits at the expense of others*." *Axonics*, 73 F.4th at 957 (emphasis added). In other words, there is no legal rule requiring all—or even key—benefits of a prior-art reference to be retained in a proposed combination. Again, the question is whether the evidence establishes a motivation to combine to reach the claimed invention. There has been no legal error because substantial evidence supports both the Board's findings that Perego suggests JEDEC-compliant embodiments and that market forces would have motivated the proposed combination.

That just leaves Netlist's pivot to a request that the Board's decision be vacated for not specifically addressing one of Netlist's arguments concerning Perego's disclosure of "flexibility." However, Netlist fails to acknowledge that the Board did, in fact, address that very disclosure; the Board just found as a factual matter that this flexibility supported Petitioner's position, not Netlist's. Appx27-28, Appx81-82 (citing Appx7337 (6:34-43)). The Board was not required to restate Netlist's argument verbatim when it expressly rejected the factual consequence.

The Court should affirm.

26

## ARGUMENT

## I.   Standard of Review

This Court reviews legal conclusions de novo and factual findings for substantial evidence. *Almirall, LLC v. Amneal Pharms. LLC*, 28 F.4th 265, 271-72 (Fed. Cir. 2022). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229-30 (1938)). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

"Whether a claimed invention is unpatentable as obvious under § 103 is a question of law based on underlying findings of fact." *In re Gartside*, 203 F.3d at 1316. Those underlying facts include "the scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, and any objective indicia of non-obviousness." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007); *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)). "[T]he question of what [the prior art reference] teaches . . . is a factual question." *PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1364 (Fed. Cir. 2018) (citation omitted).

"Whether a skilled artisan would have been motivated to combine references or would have had a reasonable expectation of success in combining references are questions of fact reviewed for substantial evidence." *Elekta Ltd. v. ZAP Surgical Sys., Inc.*, 81 F.4th 1368, 1374 (Fed. Cir. 2023).

## II. The Board had substantial evidence of known reasons a POSITA would have been motivated to combine Perego's teachings with the JESD79-2 JEDEC industry standard

The Board found and explained two known reasons, each independently supported by substantial evidence, why a skilled artisan would have been motivated to combine Perego's teachings with the JESD79-2 JEDEC standard. Appx22-30; Appx76-84. The Board found motivation to combine from Perego's express disclosures suggesting embodiments with a JEDEC-compliant architecture. Appx22-28; Appx76-82. Independently, the Board found motivation from market forces—namely, JEDEC's market dominance—that would have spurred a skilled artisan to implement Perego's teachings in a JEDEC-compliant module. Appx28-30; Appx82-84. Netlist's assertions regarding Perego's "intended purpose," "translation functionality," and "principles of operation" fail to address the substantial evidence supporting the Board's two findings. This Court can uphold the Board's judgment on either finding.

28

**A.    Perego discloses JEDEC-compliant embodiments, thus suggesting their combination with the JESD79-2 JEDEC industry standard**

Netlist's statement that "[e]veryone—Netlist, the Board, and even Samsung—agrees that Perego's memory system uses the Rambus architecture" is pure misdirection.  Br.38.  The problem with Netlist's statement is that there is no singular "Perego's memory system."  While some embodiments in Perego use the Rambus architecture, the Board agreed with Petitioner that Perego also discloses other embodiments incompatible with a Rambus architecture: "Perego's disclosure suggests a JEDEC-compliant interface to a memory controller."  Appx28; Appx82.  The Board correctly found that a JEDEC-compliant implementation of Perego was supported by at least four different express disclosures in Perego: (1) bussed topologies compatible with JEDEC, in contrast to Rambus's point-to-point topology; (2) a 64-bit data width, which is compatible with JEDEC but not Rambus; (3) individual control lines, including individual address lines for RAS and CAS signals, which is compatible with JEDEC but not Rambus; and (4) flexibility and upgradability.  Appx22-28; Appx76-82.  The Board's findings as to a POSITA's understanding of any one of these disclosures suffices to justify its conclusion that Perego suggests a JEDEC implementation, and Netlist fails to show that the Board's reading of any single disclosure—let alone all of them—lacks substantial evidence.  Each of those factual findings, by itself, defeats the key premise for Netlist's entire appeal.

### 1. Perego's bussed topology embodiments confirm that Perego discloses non-Rambus applications

Perego is not limited to using a Rambus-style "point-to-point" architecture as repeatedly asserted by Netlist. *See, e.g.*, Br.26-28, 38-40. Instead, the Board correctly recognized that Perego discloses ***alternative*** embodiments that use a JEDEC-compliant "bussed" topology. Appx22-23, Appx27-28 (quoting Appx7335 (2:22-29), Appx7337 (6:34-43), Appx7338 (8:42-47)); Appx76-77, Appx81-82 (same).

The Board also rejected Netlist's attempt to recast the bussed topology embodiments in Perego as a variant of the Rambus-style point-to-point topology. Appx23; Appx77. Netlist's expert attempted to conflate the two alternative topologies into something he called "point-to-point ***buses***," but the Board recognized that "Perego does not use this terminology." Appx22-23 (citing Appx11445-46 ¶95); Appx77 (citing Appx14032-33 ¶98). Perego refers only to "point-to-point ***links***." Appx23; Appx77 (citing Appx7336-40 (4:66-67, 5:14-15, 5:56, 5:63-64, 6:11, 6:17, 6:23-24, 7:1, 7:3, 7:8-9, 8:20, 8:42, 8:48-49, 8:67, 9:8, 9:48, 11:9, 11:12, 11:22, 11:27-28, 11:40, 12:14-15, 12:41)). Instead of conflating these two topologies together, Perego expressly distinguishes between the number of transceiver points used by point-to-point links and by busses: "the point-to-point link consists of two transceiver connection points while a bus consists of more than two transceiver points." Appx7338 (8:51-65). Perego also describes the two topologies

as alternatives to each other (not the same thing as suggested by Netlist): "Signaling over **point-to-point links** 320a–320n **or alternatively**, over **bussed** topologies." Appx7338 (8:42-47). In this way, Perego draws a clear distinction between embodiments using point-to-point links and embodiments using a bussed topology. Appx23, Appx77 (citing Appx7338 (8:42-47, 8:51-65)). Based on that evidence, the Board reasonably determined that "Perego discloses busses as **an alternative to** the point-to-point topology that [Netlist's expert] says is indicative of Rambus XDR." *Id.*; *see also* Appx7336 (3:41-47).

Perego's departure from the point-to-point topology in some embodiments confirms that Perego is not limited to Rambus-compliant embodiments. Netlist itself emphasizes that using a point-to-point topology is central to a Rambus architecture. *See* Br.18, 38-39 ("[A] skilled artisan would understand Perego's repeated references to 'point-to-point links' to refer to a Rambus architecture[.]"); *see also* Appx22, Appx76 ("And, it may be true that a person of ordinary skill in the art would have understood Perego's point-to-point terminology to refer to the Rambus XDR architecture[.]" (citing Appx7338 (8:1-9))). As a natural corollary, a POSITA would conversely understand that alternative embodiments in Perego that do **not** use this point-to-point topology would **not** use a Rambus architecture. *See supra* pp.30-31; *see also* Appx1580-83 ¶¶212-13 (POSITA would recognize "a JEDEC-style bus" in Perego's Figure 1); Appx13714-17 ¶¶221-22 (same); Appx11904 (29:3-11) (Perego

31

"doesn't limit his invention in any way to a point-to-point topology."). And because there were "[t]wo principal designs" in the early 2000s (i.e., JEDEC and Rambus), Br.11, Perego's embodiments that did not use Rambus architecture would suggest a JEDEC-compliant architecture given that it was "dominant in the market," Appx28-29, Appx82-83.

Netlist mischaracterizes the Board's analysis by arguing that the word "bus" alone does not suggest a JEDEC-compliant embodiment. Br.51-52 (citing extrinsic evidence at Appx7003, Appx7007). The Board's analysis was not so simplistic. Instead, the Board accurately analyzed how Perego used the term "bus" in contrast to the point-to-point topology of Rambus. *See* Appx22-23; Appx76-77. Although the extrinsic evidence cited by Netlist uses the word "bus" in the context of both Rambus and JEDEC, that extrinsic evidence leaves no doubt that a POSITA would understand the distinction between Rambus and JEDEC:

> Rambus DRAM (RDRAM) is very different from traditional main memory. It uses a bus that is significantly narrower than the traditional bus . . . .

> JEDEC SDRAMs use the traditional DRAM-system organization . . . . The data bus is relatively wide: in modern PC systems, it is 64 bits wide, and it can be much wider in high-performance systems.

Appx7003, Appx7005. Rather than relying on the word "bus" alone, the Board reasonably found that a POSITA would understand Perego as distinguishing between JEDEC-compliant busses and Rambus-style links. Appx22-23, Appx27-

28; Appx76-77, Appx81-82. And "[w]here two different, inconsistent conclusions may reasonably be drawn from the evidence in record, [the PTAB]'s decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Cree, Inc.*, 818 F.3d 694, 701 (Fed. Cir. 2016).

### 2. Perego's 64-bit-width embodiment is compatible with JEDEC, but not Rambus

The Board correctly identified the disclosure of higher bit-width interfaces (such as 64 bits wide) as another instance of Perego's teachings not being limited to Rambus applications. Appx23-25; Appx77-79. According to evidence cited by Netlist's expert, the largest module data width disclosed for the Rambus XDR architecture was 36 bits. Appx23-24 (citing Appx11446 ¶96); Appx77-78 (citing Appx14033 ¶99); *see also* Appx10724. Yet Perego expressly contemplates data widths ($W_{DP}$) of 64 and 128 bits. Appx23-24, Appx77-78 (citing Appx7341 (14:16-23)). The Board relied on the testimony of Petitioner's expert that a POSITA would have understood that the 64-bit width ($W_{DP}$) in Perego "corresponds to [the] 64-bit data width of a JEDEC-compliant registered DIMM module." Appx24 (quoting Appx1585 ¶215); Appx78 (quoting Appx13720 ¶224); *see also* Appx6160 ("64/72 bit-wide"). The Board also identified testimony from Netlist's expert that "confirms that a 64-bit width was a JEDEC width." Appx24 (citing Appx11429-30 ¶72; Appx11435-36 ¶82); Appx78 (citing Appx14015 ¶72; Appx14022 ¶85). Based on

33

its assessment of the expert testimony, the Board reasonably found that Perego's inclusion of a 64-bit-wide interface confirmed to a POSITA that Perego's teachings are not limited to Rambus applications.  Appx24; Appx78-79.

Netlist wrongly contends that the Board confused the bit-width used between the buffer and the memory controller ($W_{DP}$), with the bit-width used between the buffer and ranks of memory devices.  Br.52-53 (citing Appx7341 (14:10-21)). Netlist's argument ignores the Board's finding that "Perego discloses a serialization ratio of 1:1, meaning that the memory device access width ($W_A$) and the configured buffer device interface width ($W_{DP}$) are the same."  Appx70-71 (citing Appx7341 (14:32-40); Appx7343 (17:22-28)); *see also* Appx24; Appx1585 ¶215; Appx1634 ¶281.  Netlist does not challenge this finding on appeal.  The Board's finding of Perego teaching a 1:1 ratio supports the determination that disclosure of embodiments employing a 64-bit-wide controller interface *is* "the same thing as saying Perego's module could interface on the other side with, for example, a 64-bit rank of 8 x8 DRAMs."  Br.52-53 (emphasis omitted).

The Board also correctly rejected Netlist's argument "that Perego's configurable buffer width makes it unsuitable to be implemented as an RDIMM, which has a fixed buffer width."  Appx24-25; Appx79.  Perego teaches that the "configurable width" feature of the buffer is optional, Appx7336 (4:42-45), and that without the "configurable width" the buffer still enables "high capacity, without

34

compromising performance," Appx7336 (3:28-31). In any event, nothing in the proposed combination or the JEDEC standards is incompatible with Perego's configurable-width buffer. In particular, Perego discloses multiple options for its buffer width (e.g., $W_{DP}$ of 32, 64, or 128 bits), *see* Appx7341 (14:21); Appx10123 (annotating Appx7325), and JEDEC also permitted modules to have those different widths for the DDR2 version of the standard (e.g., 32, 64, and 128 bits), *see* Appx11828 ("Data Width"); Appx11821 ("DDR2 version"), contrary to Netlist's assumption that "if Perego's modules were made JEDEC-compliant, they would be stuck at a single bit width" "for any given version of the standard," Br.53. Accordingly, the Board correctly found that there is no "incompatibility" between Perego and JEDEC given that "Perego discloses the [64-bit] width along with other widths." Appx24-25; Appx78-79.

### 3. Perego discloses individual control lines compatible with JEDEC, but not Rambus

The Board's substantial evidence for finding that Perego teaches JEDEC-compliant embodiments also included Perego's disclosure of embodiments using individual control lines. *See* Appx25-26; Appx79-80. Specifically, Perego states that "[i]n *alternative embodiments*, control lines (RQ) may comprise individual control lines, for example, row address strobe [(RAS)], column address strobes [(CAS)], etc., and address lines." Appx7339 (9:58-60); *see also* Appx7339 (9:43-60). Using individual control lines for these signals is a hallmark of "JEDEC module

35

input signals and not Rambus signals," as shown below.   Appx25-26 (citing Appx7339 (9:50-60); Appx7323 (Fig.4A); Appx6250; Appx6492; Appx6161; Appx8242-43 (235:1-236:25), and quoting Appx11411-12 ¶46); Appx79-80 (citing same, and quoting Appx13998-99 ¶46).



Appx10104 (annotating Appx7323; Appx7339 (9:50-60); Appx6250).

Netlist misconstrues the Board's analysis of Perego's individual control lines as relying simply on generic control lines.  Br.51-52.  But the Board did not rely on the disclosure of control lines in general: the Board specifically cited Perego's alternative embodiment with "***individual***" control lines for "row address strobe [(***RAS***)], [and] column address strobe [(***CAS***)]," which "are JEDEC module input signals and ***not*** Rambus signals."   Appx25-26 (citing Appx7339 (9:58-60);

Appx6161 (JEDEC standard requiring "RAS . . . row address strobe" and "CAS . . . column address strobe"); Appx 6492 (similar); Appx8242-43 (235:1-236:25) (admission by Netlist's expert that Rambus does not have pins for "RAS" and "CAS" signals)); Appx79-80 (same). Netlist has not—and cannot—explain how a POSITA could implement this embodiment from Perego in a Rambus architecture when individual RAS and CAS signals do not exist in the Rambus architecture (but do exist in the JEDEC architecture). The Board's finding is not analogous to saying that a generic magnetic tape in a Betamax suggests switching to VHS. *Contra* Br.52. A better analogy would be that the disclosure of an alternative embodiment using a specialized magnetic tape that works specifically with VHS, but not with Betamax, suggests using VHS.

### 4. Perego's "flexibility" and "upgradeability" teach compatibility with JEDEC modules

The Board also relied on Perego's disclosed "flexibility" and "upgradeability" to support its conclusion that "Perego is not limited to a Rambus-style architecture at the module interface" and instead "suggests a JEDEC-compliant interface to a memory controller." Appx27-28 (quoting Appx7335 (2:22-29), Appx7336 (3:25-28), and Appx7337 (6:34-43)); Appx81-82 (same).

Specifically, the Board identified how Perego suggests alternatives for applying its teachings, including many "possible module configurations" and various "generations of controllers … [and] memory devices." Appx27 (quoting

37

first Appx7336 (3:25-28), then Appx7337 (6:34-43) (emphasis omitted)); Appx81 (same). The Board reasoned that it would be inconsistent with Perego's stated interest in "flexibility" and "upgradeability" to find that Perego's data buffering teachings were "limited to a Rambus-style architecture at the module interface." Appx27-28; Appx81-82. Rather, the Board found that a skilled artisan would understand "Perego would leave the option open" of using a JEDEC-compliant memory module, such that its data buffering may be used with a "JEDEC system." Appx27; Appx81-82.

## B. Market forces also would have motivated a POSITA to combine Perego's teachings with the JESD79-2 JEDEC industry standard

As an independent motivation to combine, the Board found that market forces would have driven a POSITA to implement Perego's teachings in a JEDEC-compliant memory module. Appx28-29 (quoting Appx11429-30 ¶72), Appx30 (citing Appx1558-59 ¶183); Appx82-83 (quoting Appx14015 ¶72), Appx84 (citing 13690-91 ¶188). This finding, too, is supported by substantial evidence. Indeed, none of the facts underlying that finding are even contested. Netlist's brief does "not dispute" that both "design need and market pressure" existed at the relevant time to pursue the proposed combination. *Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1351 (Fed. Cir. 2010). The Board's motivation-to-combine finding, therefore, is virtually unassailable.

As the Board recounted in its decision, both parties had agreed that JEDEC-standardized modules "were dominant in the market at the relevant time." Appx28; Appx82. Netlist itself acknowledges that, by the 2004 priority date, "the JEDEC approach . . . [had] bested Rambus in the marketplace." Br.19; *see also supra* p.7 (quoting the admission by Netlist's expert that "the JEDEC way of doing things . . . won out" and "the industry did select the JEDEC approach and reject the Rambus approach" by 2004-2005). A POSITA considering application of Perego's teachings as of the priority date would have had every reason to consider JEDEC; no one used a Rambus memory architecture anymore. *See Yeda Rsch. v. Mylan Pharms. Inc.*, 906 F.3d 1031, 1041 (Fed. Cir. 2018) (motivation to combine is assessed "as of the priority date"). The Board therefore found that market forces would have motivated a skilled artisan to implement Perego's teachings in a JEDEC system. Appx28-29; Appx82-83. And Netlist concedes the Board's reasoning, recognizing that "a given standard's market dominance might indicate that skilled artisans would have a motivation to make products comply with that standard." Br.50.

Furthermore, the Board found that the benefits of Perego's teachings would have been obvious to a skilled artisan for *any* memory architecture: "Perego expressly discloses buffering data and its benefit—isolating the memory devices from the memory controller." Appx40; Appx91. Netlist's expert conceded that a POSITA would have understood that "reducing or otherwise managing loads to

39

minimize their impact on data communications is a good thing." Appx8137-38 (130:23-131:8); *see also* Br.19 (acknowledging that "higher load and worse performance" caused by increasing the memory capacity of JEDEC-compliant modules was a known "problem"). As the Board found, market incentives alone would have made apparent the benefits of using Perego's teachings in a JEDEC-compliant module. Appx29 ("JEDEC . . . was the dominant memory module style in the market. Given JEDEC as the standard, an ordinary skilled artisan would have reason to pursue [the proposed combination] as a known option."); Appx83 (same). Perego's data buffering provided known benefits to a memory architecture, and JEDEC was the "standard" for memory architecture in the mid-2000s.

The Board's finding of a motivation to combine thus exemplifies a straightforward application of *KSR*. As Netlist agrees, under *KSR*, "'market forces' can supply a motivation to combine or modify references in an obviousness analysis." Br.50 (quoting *KSR*, 550 U.S. at 417). Here, market forces would have incentivized a skilled artisan to design memory modules in a JEDEC-compliant fashion—to ensure compatibility with the dominant memory system on the market. *See* Appx28-29; Appx82-83; Br.50. And Perego's data buffering would have provided benefits to a JEDEC-compliant memory architecture: "isolating" the "load" caused by increasing the memory capacity. *See* Appx40; Appx91; Br.19.

40

Netlist nevertheless contends that the Board's finding reflects a "misunderstanding of *KSR*." Br.50. In Netlist's view, the Board erred by allowing "market forces" to "inform the interpretation of [Perego]." Br.50. But Netlist misunderstands the Board's finding. No hindsight is involved here—the Board did not rely on market forces to determine that *Perego* would have "'suggest[ed]' compliance with the dominant standard." *Contra* Br.51. Rather, the Board relied on market forces to find that, at the relevant time, a *skilled artisan* would have had reason to implement Perego's data buffering in a JEDEC-compliant memory architecture. The Board's finding that "market forces" establish a motivation to combine is independent from its findings relating to disclosures within Perego that teach JEDEC-compliant embodiments. *See* Appx28, Appx82 ("agree[ing] with Petitioner" that "the dominance of JEDEC-compliant modules 'provid[es] *additional* motivation for the proposed combination'"). Perego did not need to say that its data buffering should be used in a JEDEC system because, by 2004, JEDEC's marketplace dominance would have strongly incentivized such an implementation.

## C. The Board did not commit legal error, because its factual findings establish that Perego's JEDEC-compliant embodiments in combination with JESD79-2 are operable for their intended purpose

Netlist's primary argument on appeal rests entirely on the false premise that Perego's "intended purpose" is limited to Rambus-style applications. Br.1, 37. However, the Board found the opposite: "Perego's disclosures are not limited to

[Rambus's] architecture." Appx22, Appx76. As explained above, this finding is supported by substantial evidence because Perego discloses alternative, JEDEC-compliant embodiments. *Supra* pp.29-37. Furthermore, Netlist's argument fails to rebut the Board's finding of a motivation to apply Perego's data buffering to the market-leading JEDEC architecture. Appx28-30, Appx40 ("Perego expressly discloses buffering data and its benefit"); Appx82-84, Appx91 (same).

In an attempt to bypass those factual hurdles, Netlist mischaracterizes the Board's findings. The Board never, in fact, "agreed with Netlist that [Petitioner's] obviousness theory rendered [Petitioner's] primary reference inoperable for its intended purpose." Br.1 (emphasis omitted). The Board's actual statement was as follows: "But *Patent Owner*'s 'proposed' modifications would make Perego's system non-functional for Rambus, not for JEDEC, which was the dominant memory module style in the market." Appx29; Appx83. As explained further below, this statement highlights the Board's *disagreement* with Netlist's interpretation of Perego, not that the Board "*agreed* with Netlist," Br.1. The Board correctly found that combining the JEDEC-compatible embodiments from Perego with JESD79-2 would do no harm to the operability of such embodiments. *See* Appx27-29; Appx81-83. Given the Board's factual findings, the "unbroken line of precedent" cited by Netlist (Br.37) does not support Netlist's arguments, as discussed further below, *infra* pp.52-58.

42

### 1. Netlist mischaracterizes the Board's decision

Netlist repeatedly twists a partial quote from the Board in an effort to manufacture legal error where none exists. For example, Netlist asserts that "the Board further agreed with Netlist that *Samsung's* 'proposed' modifications [to Perego] would make Perego's system non-functional for Rambus.'" Br.32 (citing Appx29; Appx83). But Netlist distorts the Board's quote in two significant ways. First, Netlist omits the end of the quote, which clarifies that Perego's JEDEC-compliant embodiments are unaffected: ". . . would make Perego's system non-functional for Rambus, *not for JEDEC*, which was the dominant memory module style in the market." Appx29; Appx83. Second, Netlist wrongly dismisses the Board's reference to "*Patent Owner*'s 'proposed' modifications" as a typographical error. Br.32 n.10. That was not a typographical error. The Board correctly recognized that *Netlist*'s "proposed" modifications assumed a combination of Rambus and JEDEC, contrary to Petitioner's actual proposed combination of Perego's JEDEC-compliant embodiments with the JESD79-2 JEDEC industry standard. The full quote from the Board's decisions is below:

> Patent Owner also argues that modification of Perego's architecture and memory system with a JEDEC-compatible bus would make it nonfunctional. PO Resp. 29–30, 23–24 ("JEDEC-complaint, chip-select-dependent RDIMM architecture defined in JESD21-C is fundamentally at odds with the Rambus point-to-point topology and variable bit width interfaces of Perego."). But Patent Owner's "proposed" modifications would make Perego's system non-functional for Rambus, not for JEDEC, which was the dominant

43

> memory module style in the market. Given JEDEC as the standard, an ordinarily skilled artisan would have reason to pursue such a known option.

Appx29; Appx83.

The full quote shows that the Board understood that Rambus-compatibility was not a dispositive issue because Perego discloses embodiments compatible with JEDEC, "which was the dominant memory module style in the market." Appx29; Appx83. Netlist never addresses the "not for JEDEC" part of the Board's quote. *See, e.g.*, Br.26-28, 38-41. The Board, based on its analysis of the evidence, did not view Perego as narrowly as Netlist. Appx22-28; Appx76-82; *supra* pp.29-37. Because the Board found that Perego already disclosed embodiments with a JEDEC-style, not Rambus-style, topology, it is irrelevant that matching those embodiments with the JEDEC standards would be inoperable for *Rambus*. Perego's JEDEC-compliant embodiments could be used as intended in JEDEC-compliant applications.

Netlist is also wrong to assert that the Board's reference to "**Patent Owner**'s 'proposed' modifications" was a typographical error and that the Board intended to refer to **Petitioner**'s proposed combination. Br.32 n.10. Netlist is missing the nuance in the Board's language. The Board's quotation marks around "proposed" show that the Board understood this term was not being used in the typical sense of the word. Appx29; Appx83. Quotation marks like that are sometimes referred to as

44

air quotes. The Board understood that Netlist was not literally "proposing" modifications to Perego—instead, the Board was highlighting how Netlist had mischaracterized Petitioner's actual proposed combination to erect a strawman that Netlist could then knock down. Because Netlist's mischaracterization differed materially from Petitioner's actual theory, the Board correctly attributed the "proposed" modifications to Netlist. If the Board intended to discuss Petitioner's true proposed combination, then there would be no need for air quotes on "proposed."

The Board's attribution of those modifications to Netlist accurately reflects how Netlist sought to avoid Petitioner's actual analysis of Perego. Petitioner viewed Perego as disclosing flexible teachings for data buffering that could be implemented in embodiments with a bussed topology and individual control lines (i.e., JEDEC-compatible) *or* in embodiments with a point-to-point topology (i.e., Rambus-style). Appx1580-83 ¶¶212-13; Appx13714-16 ¶¶221-22; *see also* Appx269-70; Appx12314-15. From that starting point, Petitioner focused on combining the JEDEC-compatible embodiments from Perego with aspects of the corresponding JEDEC standard, JESD79-2. Appx270-72; Appx12315-17. In contrast, Netlist viewed Perego as disclosing a single design that always used a Rambus point-to-point topology without alternative embodiments. Appx21; Appx75-76; Appx651-55; Appx12686-89; *see also* Br.26-31, 38-41. With that contrary starting point,

45

Netlist argued that Petitioner's proposal to incorporate JESD79-2 would make the Rambus-style embodiments from Perego inoperable.  Appx655-56; Appx12689-90. The Board ultimately agreed with Petitioner that Perego disclosed JEDEC-compliant embodiments, and as a result the Board disagreed with Netlist's exclusive focus on Rambus.  Appx22-29; Appx76-83; *supra* pp.29-37.

### 2. The assignment of Perego to Rambus does not limit the scope of Perego's disclosures to Rambus architectures

Netlist invokes the employment of Richard Perego at Rambus Inc. as suggesting every embodiment in the Perego reference must be limited to the Rambus architecture.  *See* Br.26-27, 38-39.  This is a red herring and the Board certainly was justified in weighing Perego's express disclosures more heavily than where the inventor worked.  The technical disclosures in Perego (the reference) confirm that Perego (the person) was familiar with JEDEC-compliant features, like a bussed topology, 64-bit wide modules, and individual RAS and CAS control lines.  *Supra* pp.29-37.  An inventor's place of employment does not eliminate written disclosures in his patent.  *See In re Mouttet*, 686 F.3d 1322, 1331 (Fed. Cir. 2012) ("A reference may be read for all that it teaches, including uses beyond its ***primary purpose***.").

### 3. Petitioner's proposed combination does not render Perego's JEDEC-compliant embodiments inoperable for their intended purpose

Netlist's arguments about inoperability fail because there is no problem combining the JESD79-2 JEDEC standard with alternative embodiments in Perego

that are intended to utilize JEDEC instead of Rambus.  *Contra* Br.38-42.  Underlying

Netlist's arguments about the operability of Perego is a flawed assumption that any

combination of Perego with a JEDEC standard requires changing an embodiment

from a Rambus architecture into a JEDEC architecture.  *See, e.g.*, Br.41

("[Petitioner] proposed changing Perego in a way that would make it non-functional

for the very memory architecture with which Perego was designed to operate.").  But

the Board found that Perego discloses alternative embodiments that ***already*** use

JEDEC-compliant architectures, ***instead of*** the Rambus point-to-point topologies.

Appx22-23, Appx27-28; Appx76-77, Appx81-82; *supra* pp.30-33.  Netlist does not

address, much less dispute, the operability of the JEDEC-compliant embodiments of

Perego in combination with the JESD79-2 JEDEC standard.

Because the parties disagreed about whether Perego teaches JEDEC-

compliant alternative embodiments, Netlist's assertion that "this is *not* a dispute

about *whether* Samsung's obviousness theory would render Perego inoperable for

its intended purpose" is false.  Br.38.  There plainly was a factual dispute about

whether Perego's "intended purpose" was limited to Rambus applications—a factual

dispute that the Board resolved in Petitioner's favor.  Appx22-28; Appx76-82.  The

Board's factual finding that Perego discloses alternative JEDEC-compliant

embodiments is fatal to Netlist's contentions that a combination with JESD79-2

necessarily renders Perego inoperable.  Netlist cannot rely on a purportedly narrow

purpose for the Rambus embodiments in Perego as a basis to ignore other disclosed embodiments. *See, e.g.*, *Mouttet*, 686 F.3d at 1331; *Bosch Auto. Serv. Sols., LLC v. Matal*, 878 F.3d 1027, 1038-39 (Fed. Cir. 2017), *as amended on reh'g in part* (Mar. 15, 2018); *see also Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 801 (Fed. Cir. 2021) ("Indeed, one of the points on which the [Supreme] Court in *KSR* disagreed with our decision below in that case was our reliance on the primary purposes of prior-art references.").

Netlist certainly comes nowhere close to establishing that Perego would have been *completely inoperable* if used with a non-Rambus architecture, such that a skilled artisan might have viewed use of a Rambus architecture as part and parcel of Perego's purpose. Quite the opposite: Netlist has not even challenged the Board's findings that Perego's buffer device would have still achieved its actual purpose— data buffering—in a JEDEC-compliant implementation. In particular, the Board found that Perego's buffer device would have "transceive[d] and provide[d] isolation between signals interfacing to [the memory] controller 310 and signals interfacing to the plurality of memory devices 360" in the proposed JEDEC-compliant memory module—no differently than Perego would in a Rambus memory module. Appx40, Appx91 (quoting Appx7337 (6:12-15)). The Board's finding of a motivation to combine, therefore, follows from cases such as *Mouttet*. There, no one disputed that there was a fundamental "difference" in the "type of circuitry used" by two different

48

prior-art references (i.e., "electrical versus optical").    686 F.3d at 1332, 1333.

Nevertheless, the Board found, and this Court agreed, that this "difference" did not

"affect the operability" of the proposed combination: it would still function as a

"programmable arithmetic processor."    *Id.* at 1332 (distinguishing *In re Ratti*, 270

F.2d 810, 813 (C.C.P.A. 1959)).    Here too, the Board's unchallenged finding that

Perego would have still operated as a data buffer in JEDEC-compliant memory

modules is supported by substantial evidence, and Netlist does not challenge the

Board's finding that the proposed combination satisfies every limitation of the

claims.    For example, although Netlist suggests that it would have been non-obvious

to "devise a way to accommodate the additional delay occasioned by the data buffers

while still respecting JEDEC's strict timing requirements" for "CAS latency," Br.47,

Netlist does not challenge the Board's finding that satisfying these timing

requirements would have been obvious, Appx38-41; Appx89-90.

### 4.    Perego's flexibility supports a combination with the JESD79-2 JEDEC industry standard

The Board correctly recognized that Perego's touted flexibility supports

Petitioner's proposed combination.    Appx27-28; Appx81-82.    Netlist offers attorney

argument that it "is undisputed" that "Perego's forward- and backward-compatibility

would be utterly lost" if Perego were JEDEC-compliant, Br.45, but the Board found

directly to the contrary on this issue.    Specifically, the Board observed that "Perego

discloses that 'the buffer device may be a configurable width buffer device to

49

provide upgrade flexibility and/or provide high bandwidth among a variety of *possible module configurations* in the system.'" Appx27 (emphasis added by Board) (quoting Appx7336 (3:25-28)); Appx81 (same). The Board found that this statement "indicates that Perego's disclosure is concerned with more than just one type of memory module, such as a Rambus module." *Id.* The Board further found—consistent with its finding above that JEDEC was dominant in the market, *supra* pp.38-41—that "it makes sense that Perego would leave the option open to use a bus on the interface between the module and the controller and not be limited to a point-to-point system, which would limit the ability to interface with a system that uses a bus, such as a JEDEC system." Appx27; Appx81-82. Indeed, Netlist emphasizes Perego's goal of compatibility with "new generations of controllers," Br.45, while completely ignoring that it was undisputed that JEDEC had defeated Rambus in the market meaning that the "new generations of controllers" would be compatible with JEDEC not Rambus, *supra* pp.38-41.

The Board's interpretation of "flexibility" in Perego is supported by substantial evidence. *Randall Mfg.*, 733 F.3d at 1362 (noting that "underlying factual determinations," including on "the scope and content of the prior art," are reviewed for "substantial evidence"). Here, both Perego itself and the testimony of Petitioner's expert provide more than enough evidence to affirm the Board's factual findings above. Appx27-28 (quoting Appx7335 (2:22-29), Appx7336 (3:25-28),

and Appx7337 (6:34-43)); Appx81-82 (same); *see also* Appx30 (citing Appx1558-59 ¶183); Appx84 (citing 13690-91 ¶188).

Netlist attempts to replace the Board's findings with a different view of Perego's touted flexibility, suggesting this flexibility ***restricts*** the ways in which Perego could be implemented by a POSITA. Br.44-45. There is inherent tension in Netlist's argument: ostensibly, a flexible component should be useful in more applications, not fewer. Nonetheless, Netlist asserts that a Rambus architecture is necessary to preserve Perego's flexibility. *Id.* For example, Netlist contends that only a Rambus architecture would take advantage of Perego's "buffer translation functionality." Br.44 (citing Appx7339 (10:60-67)). But Perego teaches that this functionality "may" be used—not that it must always be used—and Perego does not limit this functionality to only translating from Rambus to JEDEC as suggested by Netlist. Appx7339 (10:54-67). Perego discloses alternative embodiments and permits mixing and matching different memory devices and architectures by having the buffer device "translate protocols employed by [the] controller 310 to the protocol utilized in a particular memory device." Appx7339 (10:59-67). Perego teaches that "[d]ifferent types of memory devices may be included on different modules within a memory system," meaning, for example, that the memory system can be JEDEC-compatible, with one module including DDR2 memory devices (as asserted by Petitioner's obviousness combination), while another module may

include Rambus memory devices.  *Id.*  That is entirely consistent with the Board's finding that "Perego's disclosure is concerned with more than just one type of memory module, such as a Rambus module."  Appx27; Appx81.

In any event, the "translation functionality" was merely one optional feature in Perego, and as discussed below, a "skilled artisan may be motivated to combine particular features of different references, *e.g.*, *to secure some benefits at the expense of others*."  *Axonics*, 73 F.4th at 957 (emphasis added).  Netlist does not challenge the Board's finding that Perego teaches the beneficial ability to electrically "isolat[e] the memory devices from the memory controller," Appx40, Appx91 (citing Appx7337 (6:12-15)), which a POSITA would be motivated to implement in a JEDEC-compliant module given the dominance of JEDEC in the marketplace, *supra* pp.38-41, regardless of whether that combination would also take advantage of the optional "translation functionality" cited by Netlist.

### 5.    Netlist's cited cases do not show legal error by the Board

Netlist devotes considerable space in its brief to inapposite cases concerning modifications to a reference that would render the reference inoperable for its intended purpose.  *See* Br.37-38, 41-44.  However, there is no legal rule requiring a proposed combination to honor the "intended purpose" of a prior-art reference.  On the contrary: "the intended purpose of [Perego] does not control."  *Intel*, 21 F.4th at 800.  So even ignoring the substantial evidence supporting the Board's rejection of

52

Netlist's assertion that the "purpose" of Perego is to use a Rambus architecture, there would still be substantial evidence for the Board's finding of a motivation to combine.

Proper obviousness analysis does not "confin[e] the motivation inquiry to whether motivation would exist to make the proposed combination" for the intended "use" or "purpose" of an underlying prior-art reference, and taking such an approach constitutes "fundamental legal error." *Axonics*, 73 F.4th at 956-57. Instead, the obviousness inquiry properly accounts for the fact that "familiar items may have obvious uses beyond their primary purposes." *KSR*, 550 U.S. at 420-21 ("The idea that a designer … would ignore Asano because it was designed to solve the constant ratio problem [rather than to make an adjustable electronic pedal] makes little sense."). As long as a motivation exists to make the proposed combination, and the proposed combination reveals the claimed subject matter—as here—the obviousness inquiry is satisfied. *Axonics*, 73 F.4th at 957-58. That is true even if the supposed purpose of a reference is a bona fide "requirement[]" of that reference. *Id.* at 957 ("The inquiry is not whether a relevant artisan would combine a first reference's feature with a second reference's feature to meet requirements of the first reference that are not requirements of the claims at issue."). Applying that law, the Board's market-forces rationale provides substantial evidence for the Board's

53

finding of a motivation to implement Perego's teachings in a JEDEC-compliant memory module, independent of the supposed purpose of Perego.

Netlist ignores the relevant caselaw above. Instead, Netlist repeatedly cites *In re Fritch* and *In re Gordon* for the proposition that "a proposed modification [is] inappropriate for an obviousness inquiry when the ***modification*** render[s] the prior art reference inoperable for its intended purpose." Br.33-34, 37, 41 (citing *In re Fritch*, 972 F.2d 1260, 1265-66 n.12 (Fed. Cir. 1992)); Br.37, 42-43 (citing *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984)). But the Board's findings here are different: Perego discloses alternative JEDEC-compliant embodiments, *see* Appx27-32; Appx81-86; *supra* pp.43-46, so unlike in *Fritch* and *Gordon*, those embodiments can be combined with the JESD79-2 JEDEC standard without modification and without losing any operability. *See In re Urbanski*, 809 F.3d 1237, 1243 (Fed. Cir. 2016) (distinguishing *Gordon* because "the Board correctly found that [the two prior art references] are combinable"). Netlist's citations to *In re Ratti*, 270 F.2d at 813, suffer from the same deficiency because, unlike the Board's finding here of JEDEC-compliant embodiments, in that case a "sealing effect" would be lost in a proposed combination. Additionally, those cases involved combinations for which POSITAs did not have a countervailing motivation. *Fritch*, 972 F.2d at 1265-66 (rejecting "incentive" to use water conduit as a landscape retainer); *Gordon*, 733 F.2d at 902 (rejecting "any motivation" to turn liquid strainer upside down); *Ratti*,

54

270 F.2d at 813 ("we find nothing in the art of record which suggests appellant's novel oil seal").

Netlist's reliance on *Chemours Co. FC v. Daikin Industries, Ltd.*, 4 F.4th 1370 (Fed. Cir. 2021), fails for the same reasons. Br.46. *Chemours* found no evidence of reason or motivation, *id.* at 1376-77, in contrast to the multiple reasons found by the Board. Netlist's attempt to analogize *Chemours* to modifying Perego's memory modules to be JEDEC-compliant independently fails for ignoring the Board's finding that Perego already discloses embodiments with non-Rambus applications. Appx22-28; Appx76-82; *supra* pp.29-37.   The substantial evidence of JEDEC-compliant embodiments and market dominance that independently support the Board's motivation finding also distinguish Netlist's other cases. *In re Schweickert*, 676 F. App'x 988, 994 (Fed. Cir. 2017) (nonprecedential) (no "obvious improvement"); *Merck Sharp & Dohme B.V. v. Warner Chilcott Co.*, 711 F. App'x 633, 637 (Fed. Cir. 2017) (nonprecedential) ("[n]othing in" the prior art "suggests picking these values out of the innumerable possible combinations").  Netlist's final cases merely affirmed findings of no motivation, the opposite of this appeal. *See Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*, 600 F. App'x 755, 759-60 (Fed. Cir. 2015) (nonprecedential); *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001) (reversing JMOL and reinstating jury verdict of non-obviousness); *Adidas AG v. Nike, Inc.*, 963 F.3d 1355, 1358-60 (Fed. Cir. 2020).

Instead, this case is like *Raytheon Co. v. Sony Corp.*, in which this Court affirmed the Board's decision holding that the challenged claims, which involved manufacturing stacked semiconductors with silicon, were unpatentable as obvious over the prior art, including Liu.  727 F. App'x 662, 664-65 (Fed. Cir. 2018) (nonprecedential).  In doing so, the court rejected the same argument that Netlist makes here—that "the Board failed to address its argument that using silicon in [the prior art reference's] devices would render them inoperable."  *Id.* at 666.  Even though the prior art at issue taught that silicon-based devices are unsuitable for some applications, the Board recognized (and this Court agreed) that the prior art did not teach away from using silicon "for *other* applications, including microelectronics applications."  *Id.* at 666-67.  Just as the prior art in *Raytheon* disclosed alternative applications, Perego teaches both Rambus-style and JEDEC-compliant embodiments, and the Board thus rightly rejected Netlist's arguments about inoperability.  Appx22-29; Appx76-83; *supra* pp.29-37.

The cases Netlist cites are also distinguishable for another fundamental point: "[a] reference may be read for all that it teaches, including uses beyond its ***primary purpose***."  *Mouttet*, 686 F.3d at 1331.  Netlist contends that "Rambus is Perego's ***principal*** focus," Br.40, but Netlist ignores the Board's factual finding that "Perego's disclosure suggests a JEDEC-compliant interface to a memory controller," Appx28; Appx82.  That factual finding cannot be ignored simply

56

because JEDEC-compliance may not have been Perego's primary purpose.  This principle is well-illustrated in *Bosch*, where the parties disputed whether a reference disclosed a "***plurality*** of means for activating sensors."  878 F.3d at 1038-39.  While the preferred embodiment in the prior art reference at issue used a ***single*** 125 kHz signal as the activating means, the reference also stated that "***ranges*** of frequencies" could be used.  *Id.*  This Court thus affirmed the Board's conclusion that the prior art disclosed the requisite ***plurality*** of activating means, notwithstanding the narrow, preferred embodiment.  *Id.*

The facts here are also similar to *Enova Technology Corp. v. Seagate Technology (US) Holdings Inc.*, where this Court rejected a patent owner's argument that "the Board found that the combination would have been inoperative, but used that inoperability as a motivation to modify [one of the references]."  706 F. App'x 987, 993 (Fed. Cir. 2017) (nonprecedential).  In rejecting this argument, the *Enova* Court held that "[t]he Board did not find that [the prior art reference] and [the prior art SATA protocol] would have produced an inoperable device, but instead recognized that the combination would be inoperable if [the reference] was read as narrowly as [the patent owner] urged."  *Id.*  The Board had properly declined to read the prior art reference so narrowly, "particularly where [the reference] specifically disclosed that it could be used in a SATA system."  *Id.*  This is exactly what the Board did in this case: because Perego discloses embodiments with JEDEC-

57

compliant features, the Board declined to read Perego as limited to a Rambus architecture and rejected Netlist's inoperability arguments. This Court should affirm the Board's decision, just as in *Enova*.

> ### D. Netlist fails to rebut the substantial evidence supporting the Board's finding that a POSITA would have been motivated to combine Perego with the JESD79-2 JEDEC standard

Like its "legal error" theory, each of Netlist's arguments about whether substantial evidence supports the Board's finding of a motivation to combine fails because the Board correctly rejected Netlist's position that Perego only discloses Rambus-style embodiments. *See* Br.48-57. First, the Board correctly considered the market trend toward JEDEC, again rejecting Netlist's position that Perego is limited to Rambus applications. Second, substantial evidence supports the Board's interpretation of Perego as including JEDEC-compliant features like a bussed topology, a 64-bit-wide interface, and individual control lines. Third, the Board's finding that Perego discloses JEDEC-compliant embodiments does not involve any confusion between memory modules and memory devices.

> #### 1. The proliferation of JEDEC devices and modules would have motivated a POSITA to use Perego's techniques in JEDEC-compliant embodiments

In the early 2000s, JEDEC-compliant memory modules, particularly with DDR and DDR2 SDRAMs, dominated the market. Appx11429-30 ¶72; Appx14015 ¶72; Appx8152-53 (145:17-146:24); Appx8194 (187:21-25); Appx8290-93

(283:18-286:15) ("the JEDEC way of doing things . . . won out" and "the industry did select the JEDEC approach and reject the Rambus approach" by 2004-2005). The Board correctly recognized that this market trend created a compelling incentive for a POSITA to utilize JEDEC standards in combination with existing technologies, like those described in Perego. Appx28-29; Appx82-83; *see KSR*, 550 U.S. at 419 ("[I]t often may be the case that market demand, rather than scientific literature, will drive design trends."); *see also* Appx1560-61 ¶185 (describing POSITA's familiarity with JEDEC standards); Appx13692-93 ¶190 (same).

Netlist's challenge to the Board's well-supported finding of market pressure again relies on Netlist's misinterpretation of Perego as limited to Rambus applications. Br.50 ("Perego made a conscious choice to use the Rambus approach *despite* any advantages JEDEC may have enjoyed in the market."). But as explained above, the Board rejected this narrow interpretation of Perego. *Supra* pp.29-37. Because Perego includes JEDEC-compliant embodiments, the Board correctly recognized—consistent with the testimony of Netlist's own expert—that market forces would motivate a POSITA to use those embodiments in connection with JEDEC standards. Appx28-29 (citing Appx11429-30 ¶72); Appx82 (citing Appx14015 ¶72). In this way, the Board's interpretation of Perego is not "akin to reading a Betamax user manual to refer to a VHS system." Br.50. A better analogy

59

would be that Perego is like a patent on improved magnetic tape, with an embodiment that a POSITA would understand applies to VHS and not Betamax.

Netlist also tries to downplay the impact of JEDEC's market presence by wrongly suggesting that a POSITA's motivation to combine JEDEC standards with Perego should be assessed from Perego's earliest possible priority date in January 2000, Appx7315, instead of the priority date for the challenged claims. Br.49-50. But the motivation to combine must be evaluated "at the time of invention," which in this case is no earlier than the alleged priority date in 2004. *See KSR*, 550 U.S. at 420; 35 U.S.C. § 103(a) (pre-AIA) ("at the time the invention was made").

### 2. Perego more than suggests JEDEC-compliant embodiments

Beyond a suggestion, Perego's disclosure of embodiments with a bussed topology (*supra* pp.30-33), a 64-bit-wide interface (*supra* pp.33-35), and individual control lines such as RAS and CAS (*supra* pp.35-37) confirm that Perego includes JEDEC-compliant embodiments. Netlist disputes this interpretation of Perego by suggesting that the disclosure of such individual features does not warrant modifying Perego's Rambus embodiments into JEDEC-compliant embodiments. Br.51-56. But Netlist frames the question incorrectly. Because Perego already discloses JEDEC-compliant embodiments, there is no need to modify a Rambus-style embodiment. Instead, the Board correctly focused on combining a JEDEC-

60

compliant embodiment from Perego with the JESD79-2 JEDEC standard. Appx31-32; Appx85-86.

Netlist challenges the Board's reliance on Perego's disclosure of alternative bussed topologies and individual control lines by abstracting away the relevant details. *See* Br.51-52. But the Board did not rely on the disclosure of "buses" and "control lines" in general—the Board relied on Perego's detailed discussion of a bussed topology as an ***alternative*** to a Rambus-style point-to-point topology. Appx23; Appx77; *supra* pp.30-33. Similarly, the Board relied on "individual address lines as disclosed in Perego [that] are not characteristic of Rambus-type memories." Appx26-27; Appx80-81; *supra* pp.35-37. Perego specifically calls out "row address strobe" (RAS) and "column address strobe" (CAS) signals, which are for JEDEC, not Rambus. *Id.*; Appx7339 (9:58-60). Because these specific busses and control lines are not Rambus features, Netlist's argument that "the Rambus architecture has buses and control lines too" is a strawman. Br.51.

Netlist never denies that a 64-bit-wide interface is outside of the parameters of a Rambus architecture. Br.52-54. However, Netlist instead suggests that this disclosure should be ignored because other changes would be required beyond setting the bit-width to make a module compliant with JEDEC. *Id.* But Perego's disclosure of a 64-bit-wide interface cannot be ignored. *See Mouttet*, 686 F.3d at 1331 ("A reference may be read for all that it teaches, including uses beyond is

61

primary purpose."). Instead, the Board recognized that "a 64-bit data width is a JEDEC-compliant module," which further supports the Board's interpretation of Perego. Appx24; Appx78-79.

As discussed above, the Board correctly rejected Netlist's argument about flexibility in Perego. *Supra* pp.49-52 (citing Appx27-28; Appx81-82). Netlist wrongly interprets "flexibility" to mean that every embodiment of Perego's invention must rigidly retain compatibility with the Rambus XDR topology. Br.54-55. This is both contrary to the plain disclosures of Perego and contrary to the very idea of "flexibility." First, Perego itself discloses embodiments that a POSITA would recognize are not compatible with Rambus XDR, such as those using a bussed topology, with a 64-bit-wide interface, and individual control lines. *See supra* pp.29-37. Second, being "flexible" means that the feature should be useful in multiple different environments, not limited to a single application. *See* Appx27, Appx81-82 ("In this context, it makes sense that Perego would leave the option open to use a bus on the interface between the module and the controller and not be limited to a point-to-point system, which would limit the ability to interface with a system that uses a bus, such as a JEDEC system.").

### 3. The Board correctly distinguished memory modules and memory devices

Finally, Netlist attempts to manufacture error by suggesting that the Board improperly conflated "memory devices" and "memory modules." Br.56-57. Netlist

does not explain how the Board's passing reference to a DIMM as a "memory device" in the ***Institution Decision*** impacts the merits of the Board's Final Written Decision.  Br.56-57 (citing Appx533).  In any event, a stray statement in the Institution Decision does not undermine the Board's well-reasoned analysis in its Final Written Decisions:  "[T]he Board is not bound by any findings made in its Institution Decision."  *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016).  The specific context also suggests that any inaccuracy in the Institution Decision in the Board's description of DIMM as a memory device (rather than a memory module comprising memory devices) was harmless.  Appx533.  Even accepting that "DIMM" refers to a module, as the Institution Decision repeatedly recognized, Appx529, Appx532-33, it is undisputed that Perego expressly discloses DDR2 SDRAMs, which are JEDEC-compliant memory devices.  Appx7339 (10:54-59); *see also* Appx7336 (3:62-4:12); Appx7338 (8:1-4); Appx1555-56 ¶178; Appx13687-88 ¶183.

Moreover, in the Final Written Decisions, the Board accurately considered Perego's reference to JEDEC-compliant memory ***devices*** (specifically DDR2 SDRAMs).  Appx20; Appx35-36; Appx74.  And the Board did not stop there—the Board also considered extensive evidence showing that "Perego's disclosure suggests a JEDEC-compliant ***interface to a memory controller***.  Furthermore, the evidence shows that JEDEC-compliant ***modules*** were dominant in the market at the

63

relevant time." Appx28; Appx82. In response to the Board's sound analysis, Netlist again relies on an incorrect assertion that the "whole point" of Perego requires a "Rambus-style module." Br.56-57. As explained in detail above, the Board correctly found that Perego discloses JEDEC-compliant embodiments that do not use the Rambus point-to-point topology. *Supra* pp.29-37; *see also* Appx22-23, Appx27-28; Appx76-77, Appx81-82. Those JEDEC-compliant embodiments are entirely consistent with the passage in Perego cited by Netlist. Br.56-57 (citing Appx7339 (10:54-67)). That passage teaches that "[d]ifferent types of memory devices may be included on different modules within [the] memory system"—such as DDR2 memory devices on one JEDEC-compliant module (as asserted by Petitioner's obviousness combination), and Rambus memory devices on another module in the memory system (as suggested by Netlist)—given that "buffer device 405 [may] translate protocols employed by controller 310 to the protocol utilized in a particular memory device implementation." Appx7339 (10:54-67).

## III.    The Board properly addressed Perego's touted flexibility

As an afterthought, Netlist also argues that the Board "failed altogether to address" Netlist's position that the proposed combination "would destroy Perego's forward- and backward-compatibility with different generations of memory controllers and memory devices." Br.58-61. This argument is meritless.

64

First, the Board addressed and rejected the premise of Netlist's argument—that Perego is limited to Rambus—and found, instead, as a factual matter that Perego's "flexibility" to use "different generations of memory controllers and memory devices" actually supported Petitioner's positions. *Supra* pp.49-52; Appx27-28, Appx81-82 (discussing "flexibility" and concluding that "Perego's disclosure is concerned with more than just one type of memory module, such as a Rambus module"). In doing so, the Board cited the same passage from Perego about flexibility ***in favor*** of combining Perego with JESD79-2. *Compare* Appx27 (citing Appx7337 (6:34-43)) *and* Appx81 (same), *with* Br.59 (citing Appx7337 (6:39-44)). By relying on Perego's references to "flexibility" as support for adopting Petitioner's position, the Board effectively rejected Netlist's theory that this flexibility weighs against the combination. *See id.* Thus, the facts here are the opposite of the *Polaris* case cited by Netlist, where the Board "failed to address [patent owner's] evidence." Br.60 (citing *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1067-68, 1069 (Fed. Cir. 2018)). Instead, the Board considered Netlist's evidence and found that it supported Petitioner.

Moreover, Netlist's theory about flexibility depends upon Netlist's primary contention that Perego is limited to Rambus applications, which the Board resoundingly rejected. *Supra* pp.29-37; Appx22-30; Appx76-84. Because the Board found that Perego is not limited to Rambus applications, Netlist's interpretation of

65

Perego's "flexibility"—as being limited to Rambus applications—does not make sense. The Board's comprehensive rejection of Netlist's narrow interpretation of Perego thus fully explains why the Board rejected Netlist's "flexibility" argument. It also explains why the Board rejected Netlist's argument that the combination would be "non-functional." Appx29 (rejecting Netlist's arguments at Appx649-50, Appx655-56); Appx83 (rejecting Netlist's arguments at Appx12683-84, Appx12689-90).

Netlist's argument that the Board did not address "core functionalities" of Perego, Br.59, is also untenable in view of the Board's decisions. The Board specifically rejected Netlist's "suggestion" that functionality "central to Perego" weighed against a motivation to combine. Appx24-25 (addressing impact of Perego's "configurable buffer width"); Appx78-79 (same).

The Board's consideration of the issues was also "commensurate" with Netlist's arguments. *Polaris*, 882 F.3d at 1066-67. Netlist now suggests, in passing, that the Board did not address an argument about "translation." Br.4. But during the IPRs, Netlist linked Perego's "translation" functionality to its overall argument regarding "flexibility." Appx963-65 (50:18-52:2); Appx977 (64:18-:20) ("translation capability" allows Perego to be "super flexible"). And on appeal Netlist again frames its argument as one about "flexibility." Br.57-61. Netlist's passing suggestion that the Board was required to address Perego's translation

66

functionality separately from Perego's flexibility conflicts with Netlist's own linking of the issues together. The Board addressing them together was appropriate under the APA.

Having addressed the impact of flexibility and compatibility, the Board was not required to repeat Netlist's arguments verbatim. The APA "does not require an agency to address every argument raised by a party or explain every possible reason supporting its conclusion." *Regents of the Univ. of Cal. v. Broad Inst., Inc.*, 136 F.4th 1367, 1384 (Fed. Cir. 2025) (internal quotation marks omitted). Additionally, "there is no requirement that the Board expressly discuss each and every negative and positive piece of evidence lurking in the record to evaluate a cursory argument." *Apple Inc. v. Gesture Tech. Partners, LLC*, 129 F.4th 1367, 1375 (Fed. Cir. 2025) (quoting *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1328 (Fed. Cir. 2017)), *petition for cert. filed* (U.S. June 16, 2025) (No. 24-1281). The analysis in each Final Written Decision shows that the Board fully engaged with Netlist's theories, and thus satisfied the APA. Appx27-28; Appx81-82.

## CONCLUSION

For the foregoing reasons, Appellees respectfully request that the Court affirm the Board's determination that claims 1-29 of the '215 patent and claims 1-15 of the '417 patent would have been obvious in light of Perego and JESD79-2 (Ground 1).

Otherwise, Appellees request remand for the Board to consider the remaining Grounds in the first instance.  Appx48; Appx96.

Dated: June 30, 2025

Respectfully submitted,

*/s/ Michael Hawes*

E. Joshua Rosenkranz
Emily W. Villano
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

Melanie L. Bostwick
Robbie Manhas
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037

Jared Bobrow
ORRICK, HERRINGTON &
   SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025

*Counsel for*
*Micron Technology, Inc., Micron*
*Semiconductor Products, Inc.,*
*Micron Technology Texas, LLC*

Michael Hawes
Lori Ding
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, TX 77002
(713) 229-1234 (telephone)
michael.hawes@bakerbotts.com
lori.ding@bakerbotts.com

Eliot Williams
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, DC 20001
(202) 639-7700 (telephone)
eliot.williams@bakerbotts.com

Theodore W. Chandler
BAKER BOTTS L.L.P.
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
(213) 202-5702 (telephone)
ted.chandler@bakerbotts.com

*Counsel for*
*Samsung Electronics Co., Ltd.*

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2025-1286, 2025-1296

**Short Case Caption:** Netlist, Inc. v. Samsung Electronics Co., Ltd., et al.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,778 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 06/30/2025                Signature: /s/ Michael Hawes

                               Name: Michael Hawes

Save for Filing